**In re SANTA FE PACIFIC CORPORATION SHAREHOLDER LITIGATION.**

No. 224, 1995.

Supreme Court of Delaware.

Submitted: Oct. 17, 1995.
Decided: Nov. 22, 1995.

Pamela Tikellis (argued), James C. Strum and Robert J. Kriner, Jr., of Chimicles, Jacobsen & Tikellis, Wilmington, Joseph A. Rosenthal and Norman M. Monhait of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Berger & Montague, P.C., Philadelphia, PA, Burt & Pucillo, West Palm Beach, FL, and Goodkind, Labaton, Rudoff & Sucharow, New York City, for Appellants.

R. Franklin Balotti, Anne C. Foster, Scott R. Haiber and Todd C. Schiltz of Richards, Layton & Finger, Wilmington, Theodore A. Livingston, Jr., Michele Odorizzi (argued), and Christian F. Binnig of Mayer, Brown & Platt, Chicago, IL, of counsel, for Appellees Santa Fe Pacific Corporation.

Kenneth J. Nachbar (argued), of Morris, Nichols, Arsht & Tunnell, Wilmington, Dennis E. Glazer and Vincent T. Chang of Davis, Polk & Wardwell, New York City, for Appellee Burlington Northern, Inc.

Before VEASEY, C.J., WALSH and BERGER, JJ.

VEASEY, Chief Justice:

In this appeal we decide when, in certain circumstances, a complaint in a corporate matter may properly be dismissed for failure to state a claim upon which relief can be granted. Plaintiffs, a class of stockholders of Santa Fe Pacific Corporation ("Santa Fe"), appeal the dismissal of their complaint for failure to state a claim under Rule 12(b)(6) of the Rules of the Court of Chancery ("Chancery Rule 12(b)(6)"). Plaintiffs filed suit against Santa Fe, its directors and Burlington Northern, Inc. ("Burlington"), challenging a merger of Santa Fe and Burlington in the face of the efforts of Union Pacific Corporation ("Union Pacific") to acquire or merge with Santa Fe through a hostile bid.

Since this matter was decided by the Court of Chancery on a motion to dismiss, the issue before us is whether, and to what extent, the well-pleaded facts (as distinct from conclusory statements), construed most favorably to the plaintiff, can be found to state a claim. We hold that the Court of Chancery correctly found that the plaintiffs failed to state a claim that there were material omissions in a proxy statement, that the Board of Directors of Santa Fe (the "Board") was under a duty to obtain the best immediate value reasonably available for the stockholders, or that Burlington is liable for aiding and abetting. We hold, however, that the Court of Chancery erred in dismissing the complaint with regard to the propriety of the Santa Fe

directors' defensive measures under *Unocal*.[1] Accordingly, we AFFIRM the dismissal of plaintiffs' disclosure claim, their claim that the Board breached its duty to seek the highest value reasonably available, and the aiding and abetting claim against Burlington. We REVERSE the dismissal of plaintiffs' claim that the Board's defensive actions were unreasonable and disproportionate, and we REMAND.

## I. FACTS[2]

Santa Fe is a publicly-held Delaware corporation with interests in railway transportation and petroleum pipelines. Burlington is also a publicly-held Delaware corporation engaged in the railroad business. Beginning in July of 1993, and continuing until November 29, 1993, the two companies discussed a merger. In June of 1994 Santa Fe simultaneously submitted a bid to purchase Kansas City Southern Railway from Kansas City Southern Industries ("KCSI") and reopened discussions with Burlington regarding a merger with Santa Fe. Subsequently, on June 29, 1994, the Board approved a merger agreement with Burlington (the "First Merger Agreement") and decided to withdraw its bid for the railroad assets of KCSI.

The First Merger Agreement contemplated a merger in which Santa Fe stockholders would receive 0.27 shares of Burlington stock for each Santa Fe share. Based on Burlington's stock price at the time, the consideration to Santa Fe stockholders was valued at $13.50 per share. Goldman, Sachs & Co. ("Goldman, Sachs"), financial advisor to the Board, delivered a written fairness opinion on June 29. The First Merger Agreement was terminable by either party if the stockholders failed to approve the merger. Further, it did not permit Santa Fe to withdraw if a higher bidder emerged, although it permitted the Board to withdraw its recommendation to stockholders.

The Chairman of Union Pacific, Drew Lewis ("Lewis"), contacted Robert D. Krebs ("Krebs"), the CEO of Santa Fe, on October 5, 1994 to communicate Union Pacific's desire to merge with Santa Fe and to schedule a meeting to discuss possible merger terms. Representatives of Santa Fe and Union Pacific met that afternoon, and Santa Fe expressed reservations based on its contractual commitments under the First Merger Agreement and the likelihood that a Santa Fe/Union Pacific merger would not receive the necessary approval from the Interstate Commerce Commission (the "ICC"). Santa Fe also threatened to file suit against Union Pacific if it advanced an unsolicited merger proposal. Union Pacific, nevertheless, proposed a transaction in which Santa Fe stockholders would receive 0.344 shares of Union Pacific stock for each Santa Fe share. Based on Union Pacific's stock price, the proposal had an indicated value of almost $18 per Santa Fe share. Union Pacific also made clear that its offer was subject to further negotiation.

At a meeting the following day, the Board rejected the Union Pacific offer, asserting that a Santa Fe/Union Pacific merger would not receive ICC approval and that Santa Fe was prevented by the First Merger Agreement from considering the Union Pacific offer. Santa Fe also refused to provide Union Pacific with non-public information to assess the value of Santa Fe. On October 26, 1994 Union Pacific provided Santa Fe with a report from a panel of experts which concluded that a Santa Fe/Union Pacific merger would have good prospects of obtaining ICC approval.

Burlington and Santa Fe announced a revised merger agreement (the "Amended Merger Agreement") on October 26, 1994, which increased the exchange ratio from 0.27 shares to 0.34 shares of Burlington stock for each Santa Fe share. The higher exchange ratio indicated a value of $17 per Santa Fe share. Goldman, Sachs opined that the exchange was fair. The other provisions of the First Merger Agreement, including the no-shop clause, remained the same.

---

1. *Unocal v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985).

2. In conformity with Chancery Rule 12(b)(6), the following facts have been drawn from the face of the complaint. To the extent that the Joint Proxy Statement is at issue in Plaintiffs' disclosure claim, it will be considered for purposes of assessing only that claim.

Union Pacific responded on October 30, 1994 by offering to merge with Santa Fe at an exchange ratio of 0.407 shares of Union Pacific stock for each Santa Fe share. This proposal had an indicated value at the time of $20 per share. Union Pacific also offered to pay a portion of the consideration in cash if Santa Fe desired. Santa Fe rejected this offer on November 2, claiming that the proposed merger would not receive ICC approval. Santa Fe suggested to Union Pacific, however, that it consider the creation of a voting trust to eliminate the risk to Santa Fe stockholders of an ICC rejection of the proposed merger. Union Pacific responded on November 8 with a transaction employing a voting trust structure designed to allow Santa Fe stockholders to receive the merger consideration before ICC approval.

The following day, November 9, 1994, Union Pacific commenced a tender offer for 57.1% of Santa Fe's outstanding shares at $17.50 per share in cash. The tender offer was to be followed by a second-step merger in which Santa Fe stockholders would receive 0.354 shares of Union Pacific stock. The voting trust would continue to be employed. In responding to the Union Pacific tender offer, Santa Fe requested, on November 11, that Burlington consider a renegotiation of the Amended Merger Agreement, and on November 14, rescheduled to December 2, 1994 the special stockholders meeting to consider the Santa Fe/Burlington merger.

The Board recommended on November 22 that stockholders not tender their shares to Union Pacific, citing the risks of ICC disapproval, the taxable nature of the tender offer, and the conditions of the offer. Union Pacific responded the same day with a letter to Krebs, citing the voting trust and Union Pacific's previously expressed willingness to negotiate the terms of its offers. Union Pacific received an informal staff opinion from the ICC on November 28, 1994 authorizing the use of the voting trust structure. On the same day, Union Pacific informed Santa Fe of the opinion.

The Board met on November 28 and adopted a Shareholder Rights Plan (the "Rights Plan") which would become effective if any person, other than Burlington, acquired at least 10% of Santa Fe shares outstanding. On December 2, 1994 Santa Fe initiated discussions with Burlington seeking to modify the terms of the Amended Merger Agreement. Santa Fe suggested that the exchange ratio be increased, that Santa Fe and Burlington conduct a joint tender offer, and that Santa Fe also make open market purchases of stock between the joint tender and the consummation of the merger. On December 14, Santa Fe again postponed its special stockholders' meeting to January 27, 1995. On December 20, 1994, by a formal order, the ICC approved the voting trust structure.

Lewis wrote to Krebs on December 16, 1994 offering to revise the latest Union Pacific proposal if Santa Fe established what Union Pacific considered fair bidding procedures. The same day, Union Pacific also extended the deadline of its tender offer to January 19. On December 17, Krebs responded to Lewis that Santa Fe was not for sale and that the Board was not conducting an auction.

On December 18, Burlington and Santa Fe reached agreement on a revised merger agreement (the "Second Amended Merger Agreement"). The Board also announced a joint tender offer for up to 33% of Santa Fe's common shares at a cash price of $20 per share. Burlington would purchase up to 13% and Santa Fe would purchase up to 20% of its stock. As a result, Burlington would own 16% of the outstanding shares of Santa Fe if the joint offer were fully completed. This would be followed by a merger of Santa Fe and Burlington at an exchange ratio of 0.4 shares of Burlington stock for each Santa Fe share. The indicated value of the merger consideration was $20.60 per Santa Fe share on December 16, 1994. The Second Amended Merger Agreement also included a $50 million termination fee to Burlington if Santa Fe accepted a higher offer and allowed Santa Fe to terminate the agreement if a higher bidder emerged. Santa Fe and Burlington issued a Joint Proxy Statement on January 13, 1995 and a Supplemental Proxy on January 25, 1995 (collectively, the "Joint Proxy") soliciting approval of the merger.

Union Pacific commenced, on January 18, 1995, a tender offer for all shares of Santa Fe at $18.50 per share. The Santa Fe Board voted on January 22 to recommend to its stockholders that they not tender their shares to Union Pacific. Burlington and Santa Fe revised the merger on January 24 to allow Santa Fe to purchase up to 10 million shares subsequent to the joint tender offer and prior to the merger (the "Repurchase Program"). The number of Burlington shares to be exchanged in the merger would remain the same, so that if all ten million shares were repurchased, the exchange ratio would rise to 0.4347 Burlington shares for each Santa Fe share. Burlington and Santa Fe also announced that the Santa Fe Rights Plan had been amended to allow Allegheny Corporation to purchase up to 14.9% of Santa Fe shares without triggering the Rights and that Allegheny had agreed to vote in favor of the Santa Fe/Burlington merger. The proposed Allegheny purchases, the joint tender offer and the Repurchase Program, if fully consummated, would have placed 33% of the shares of Santa Fe in the hands of parties committed to the Burlington/Santa Fe merger.

Separate suits filed by Union Pacific and the stockholder plaintiffs challenging the First Merger Agreement were consolidated on October 14, 1994. The Court of Chancery denied the plaintiffs' motion for expedited proceedings on a preliminary injunction on October 18, 1994. *Union Pac. Corp. v. Santa Fe Pac. Corp.*, Del.Ch., C.A. No. 13778, 1994 WL 586924 (Oct. 18, 1994). Union Pacific and the stockholder plaintiffs moved for expedited proceedings on a preliminary injunction on January 25, 1995. This motion was denied by the Court of Chancery on January 30, 1995, *In re Santa Fe Pac. Corp. Shareholder Litig.*, Del.Ch., C.A. Nos. 13778 & 13587, 1995 WL 54428 (Jan. 30, 1995), and Union Pacific withdrew its tender offer the following day.

The stockholders of Burlington and Santa Fe voted to approve the merger on February 7, 1995. Santa Fe shares which had not been purchased in the Joint Offer or the Repurchase Program were to be exchanged at closing for between 0.40 and 0.4347 shares of Burlington stock. The ICC approved the merger on July 20, 1995.

After the merger vote, on March 6, 1995, the stockholder plaintiffs filed a revised complaint. Count I alleges that the Board breached its duty to seek the best value reasonably available by failing fully to inform themselves about alternatives to the Burlington merger, failing to implement fair bidding procedures, and favoring Burlington over Union Pacific. Count II of the complaint alleges that the Board took unreasonable and disproportionate defensive measures in response to Union Pacific. Particularly, plaintiffs challenge the Rights Plan, the Joint Tender, the Repurchase Program and the Termination Fee. Count III claims that the Board breached its duty fully to disclose to the stockholders all material facts in connection with the vote on the merger. Plaintiffs claim that the Joint Proxy and Supplemental Joint Proxy omitted facts which would have been material to stockholders voting on the merger. Finally, Count IV alleges that Burlington aided and abetted the claimed breaches of fiduciary duty in the first three counts of the complaint.

## II. DISCLOSURE CLAIMS

Plaintiffs argue on appeal that the Court of Chancery improperly granted Santa Fe's motion to dismiss the disclosure claims. Plaintiffs claim that the Joint Proxy omitted material facts. Specifically, they claim that the Joint Proxy omitted material information concerning (1) the likelihood of ICC approval of a Santa Fe/Burlington merger; (2) the negotiations which led to approval of the First Merger Agreement; and (3) Santa Fe's earlier offer to acquire or merge with KCSI. Notably, they have not alleged material misstatements.

When this Court reviews a dismissal under Chancery Rule 12(b)(6), it determines "whether it appears with reasonable certainty that, under any set of facts which could be proven to support the claim, plaintiffs would not be entitled to relief." *In re Tri–Star Pictures, Inc. Litig.*, Del.Supr., 634 A.2d 319, 326 (1993). This review is generally limited to the well-pleaded facts contained in the complaint. *Id.* Conclusory allegations

will not be accepted as true without specific supporting factual allegations. *Id.* Non-disclosure claims must provide some basis for a court to infer that the alleged omissions were material. *In re Wheelabrator Tech., Inc. Shareholders Litig.,* Del.Ch., C.A. No. 11495, slip op. at 6 n. 7, 18 *Del.J.Corp.L. 778,* 788, 1992 WL 212595, Jacobs, V.C. (Sept. 1, 1992).

When seeking the affirmative vote of stockholders, the Board has a duty to disclose all material information. *Zirn v. VLI Corp.,* Del.Supr., 621 A.2d 773, 778 (1993). The materiality standard requires that directors disclose all facts which, "under all the circumstances, ... would have assumed actual significance in the deliberations of the reasonable shareholder." *Arnold v. Soc'y for Sav. Bancorp., Inc.,* Del.Supr., 650 A.2d 1270, 1277 (1994) (quoting *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)).

Plaintiffs claim that the Joint Proxy "identifies, but fails to discuss the risks of not obtaining, and thus the likelihood of approval of, the Santa Fe/BNI [Burlington] merger." The Joint Proxy identified the risk factors in the approval process and stated the Board's overall conclusion with respect to ICC approval of the merger. It is noteworthy that Plaintiffs do *not* allege that the Board did not honestly hold this belief. Rather, they argue that the Joint Proxy should have provided more elaboration of the basis for a possible ICC rejection of the merger. With respect to the risks of disapproval, the Joint Proxy stated at page 30:

> Although the SFP Board believe that it is likely that the ICC will approve a BNI–SFP merger, there is a risk that the ICC might find that the benefits to the public and the applicants from a BNI–SFP merger were outweighed by the potential harm to the public produced by such a merger, particularly any reduction in rail competition, harm to essential rail services or other factors deemed detrimental to the public interest. Opponents of the transaction may raise a number of challenges to the proposal, including allegations of diminution in competition, claims of harm to essential rail services, criticisms of the scale of the benefits claimed by SFP and BNI,

complaints about the fairness of the exchange ratio to the stockholders of the two companies, concerns about the effect of the transaction on affected employees of the two companies and similar points. For example, there are some limited areas where the BN Railroad and SFP Rail systems do overlap—such as in Amarillo and Lubbock, Texas—and it is probable that objections will be raised during the ICC proceeding about the reduction in rail competition in those areas. SFP and BNI have advised the ICC of their willingness to negotiate ameliorative arrangements to address any such reductions in competition.

This statement sufficiently apprised Santa Fe stockholders of the risk factors, and the Board should not have been required to speculate about the intentions and arguments of third parties.

Plaintiffs also allege that the Joint Proxy failed to include a description of the substance of the negotiations between Santa Fe and Burlington leading to the First Merger Agreement. Plaintiffs claim that greater disclosure of the substance of the negotiations would have shown "the zeal with which the Board negotiated the transaction...." The Joint Proxy does disclose that Santa Fe and Burlington negotiated for five days from June 24 through June 29, 1994 before reaching agreement on the First Merger Agreement. The Joint Proxy also discloses that Santa Fe and Burlington had negotiated for much of 1993 before ending the talks in November 1993. Even assuming *arguendo* the materiality of the Board's "zeal," stockholders could easily compare the relative lengths of time spent negotiating in 1993 and 1994 and reach their own conclusions with respect to the implications. We find no disclosure violation on this ground.

Finally, Plaintiffs claim that the Joint Proxy should have disclosed "the terms of Santa Fe's aborted proposal to acquire KCSI, the potential benefits to Santa Fe stockholders from a business combination with KCSI and how such benefits compared to a Santa Fe/[Burlington] transaction, or the reasons for withdrawing the KCSI bid in

favor of the First [Burlington] Merger Proposal." The Joint Proxy ran to 108 detailed pages. The stockholders were not asked to consider a merger with KCSI, and KCSI was not a bidder for Santa Fe. Additional information comparing and contrasting the Burlington merger with a hypothetical KCSI merger was not material and would have yielded little benefit at the cost of added complexity. There is also no disclosure violation on this ground.

Accordingly, we hold that the Court of Chancery committed no error in dismissing the disclosure claims.

## III. THE EFFECT OF A FULLY-INFORMED STOCKHOLDER VOTE

Santa Fe argues on appeal that the fully-informed vote of a majority of Santa Fe stockholders extinguishes the Plaintiffs' claims under *Unocal v. Mesa Petroleum Co.,* Del.Supr., 493 A.2d 946 (1985), and *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173 (1986). The Court of Chancery found that the fully-informed stockholder vote ratified the challenged transaction and extinguished any claims that the Board breached its duty of care. Plaintiffs have not challenged this decision on appeal.

The Court of Chancery held, with respect to the *Revlon* and *Unocal* claims, that a fully-informed stockholder vote does not extinguish a claim for breaches of the duty of loyalty. Categorizing these claims as arising from the duty of loyalty, the court declined to allow the vote of stockholders on the merger to extinguish the claims. Santa Fe offers the ratification theory as an alternative basis for affirming the dismissal of the *Revlon* and *Unocal* claims. As an issue of law, we review the trial court's decision *de novo. State v. Maxwell,* Del.Supr., 624 A.2d 926, 928 (1993).

■ Before reaching the merits of Santa Fe's argument, plaintiffs' procedural argument must be addressed. Plaintiffs argue that Santa Fe has forfeited its right to raise the ratification argument since it failed to file a cross-appeal from the judgment below.

Plaintiffs' argument fails to consider, however, that Santa Fe could hardly appeal the dismissal of all claims against it. Santa Fe is not challenging the judgment below or seeking to enlarge its legal rights. *See, e.g., Hoffman v. Dann,* Del.Supr., 205 A.2d 343, 355 (1964); *Chrysler Corp. v. Quimby,* Supr., 51 Del. 264, 144 A.2d 885, 886 (1958); *cf. Universal Underwriters Ins. Co. v. The Travelers Ins. Co.,* Del.Supr., 669 A.2d 45, 49, Walsh, J. (1995) (holding that appellee may not assert argument on appeal which would modify the decision of the trial court in the absence of a cross-appeal). Rather, it is offering an alternative ground, fairly raised below, for this Court to affirm the Court of Chancery. Thus, no cross-appeal is required or appropriate.

■ While the Court of Chancery concluded that claimed breaches of the duty of loyalty are not extinguished by a fully-informed stockholder vote and that *Revlon* and *Unocal* claims are duty of loyalty claims for ratification purposes, we reach the same result on different grounds. *Revlon* and *Unocal* and the duties of a Board when faced with a contest for corporate control do not admit of easy categorization as duties of care or loyalty.[3] In any event, categorizing these more specific duties as primarily arising from due care or loyalty would not be nearly as helpful in determining the effect of a fully-informed stockholder vote as would an examination of their underlying purposes.

The *Unocal* standard of enhanced judicial scrutiny rests in part on an "assiduous ... concern about defensive actions designed to thwart the essence of corporate democracy by disenfranchising shareholders." *Unitrin, Inc. v. American Gen. Corp.,* Del.Supr., 651 A.2d 1361, 1378 (1995). In *Unitrin,* referring to *Stroud v. Grace,* Del.Supr., 606 A.2d 75 (1992), we stated:

This Court also specifically noted that boards of directors often interfere with the exercise of shareholder voting when an acquiror *launches both a proxy fight and a tender offer.* We then stated that such action "necessarily invoked both *Unocal*

3. *Ivanhoe Partners v. Newmont Mining Corp.,* Del.Supr., 535 A.2d 1334, 1345 (1987).

and *Blasius*" because "both [tests] recognize the inherent conflicts of interest that arise when shareholders are not permitted free exercise of their franchise." Consequently, we concluded that, "[i]n certain circumstances, [the judiciary] must recognize the special import of protecting the shareholders' franchise within *Unocal*'s requirement that any defensive measure be proportionate and 'reasonable in relation to the threat posed.'"

*Id.* at 1379 (citations and footnotes omitted). *Revlon* also rests on "the overriding importance of voting rights, ..." *Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34, 42 (1993).

Permitting the vote of a majority of stockholders on a merger to remove from judicial scrutiny unilateral Board action in a contest for corporate control would frustrate the purposes underlying *Revlon* and *Unocal.* Board action which coerces stockholders to accede to a transaction to which they otherwise would not agree is problematic. *See Paramount Communications, Inc. v. Time Inc.*, Del.Supr., 571 A.2d 1140, 1154 (1990) ("We have found that even in light of a valid threat, management actions that are coercive in nature or force upon shareholders a management sponsored alternative to a hostile offer may be struck down as unreasonable and non-proportionate responses."). Thus, enhanced judicial scrutiny of Board action is designed to assure that stockholders vote or decide to tender in an atmosphere free from undue coercion. *Unitrin*, 651 A.2d at 1388.

■ In voting to approve the Santa Fe–Burlington merger, the Santa Fe stockholders were not asked to ratify the Board's unilateral decision to erect defensive measures against the Union Pacific offer. The stockholders were merely offered a choice between the Burlington Merger and doing nothing. The Santa Fe stockholders did not

vote in favor of the precise measures under challenge in the complaint. Here, the defensive measures had allegedly already worked their effect before the stockholders had a chance to vote.[4] In voting on the merger, the Santa Fe stockholders did not specifically vote in favor of the Rights Plan, the Joint Tender or the Termination Fee.[5]

Since the stockholders of Santa Fe merely voted in favor of the merger and not the defensive measures, we decline to find ratification in this instance. Accordingly, we now turn to the merits of plaintiffs' *Unocal* and *Revlon* claims.

## IV. THE CLAIMS SEEKING ENHANCED JUDICIAL SCRUTINY

The Court of Chancery dismissed on the merits the plaintiffs' claims under *Revlon* and *Unocal.* Since we have determined that a fully-informed stockholder vote on the merger did not extinguish claimed breaches of the duties imposed by *Revlon* and *Unocal*, we now review the Court of Chancery's dismissal of those claims. Before reaching the claims, we first must address a question regarding the proper approach to a motion to dismiss under Chancery Rule 12(b)(6).

### A. Chancery Rule 12(b)(6)

■ Plaintiffs argue on appeal that the Court of Chancery improperly considered documents outside the pleadings in ruling on defendants' motion to dismiss. Generally, matters outside the pleadings should not be considered in ruling on a motion to dismiss. Chancery Rule 12(b) provides:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed

---

4. Plaintiffs claim that the defensive measures were used precisely to prevent the stockholders from voting in favor of Union Pacific—by voting against the Santa Fe/Burlington merger and tendering their shares into Union Pacific's offer.

5. In most circumstances, "where a majority of fully informed stockholders ratify action of even interested directors, an attack on the ratified

transaction normally must fail." *Cinerama, Inc. v. Technicolor, Inc.*, Del.Supr., 663 A.2d 1156, 1176 (1995) (quoting *Smith v. Van Gorkom*, Del. Supr., 488 A.2d 858, 890 (1985)); *see also Gottlieb v. Heyden Chem. Corp.*, Del.Supr., 91 A.2d 57, 59 (1952); *Michelson v. Duncan*, Del.Supr., 407 A.2d 211, 220 (1979); *Gerlach v. Gillam*, Del.Ch., 139 A.2d 591, 593 (1958).

of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Thus, if a party presents documents in support of its Rule 12(b)(6) motion and the court considers the documents, it generally must treat the motion as one for summary judgment. *In re Tri–Star Pictures, Inc.*, Del. Supr., 634 A.2d 319, 326 (1993). Before a motion for summary judgment is ripe for decision, the non-movant normally should have an opportunity for some discovery. *See* Chancery Rule 56(e); *Mann v. Oppenheimer & Co.*, Del.Supr., 517 A.2d 1056, 1060 (1986).

The Court of Chancery, in ruling on the motion to dismiss, here, considered the Joint Proxy in its decision on all allegations of the complaint. The Court relied on the Joint Proxy and took the following as pleaded facts:

> What the complaint does allege is that the Santa Fe board (which except for defendant Krebs, is not claimed to have been other than disinterested and independent) negotiated a merger with [Burlington] based on its assessment of the strategic desirability of that combination. (Joint Proxy Statement at 24, 30, 41–42, incorporated by reference into the complaint). The [Burlington] transaction was believed to offer significant benefits in terms of geographic coverage, improved efficiency for customers through the provision of single-line service, a diversified traffic base, operating efficiencies, and financial strength. (*Id.* at 41–42).
>
> The Santa Fe board concluded that Union Pacific's initial offer was a threat, not only because it was economically and strategically inferior to the initial [Burlington] merger, but also because that offer posed a high risk of ICC disapproval. These conclusions were based on the business judgment of the Santa Fe directors, who relied on the expert advice of Santa Fe's independent investment bankers and regulatory analysts. (*Id.* at 28–29). No facts are alleged from which one could conclude that that perception was not reasonable.

*In re Santa Fe Pac. Corp. Shareholder Litig.*, Del.Ch., C.A. No. 13587, slip op. at 19–20, 1995 WL 334258 (May 31, 1995). It was certainly proper to consult the Joint Proxy to analyze the disclosure claim because the operative facts relating to such a claim *perforce* depend upon the language of the Joint Proxy. Thus, the document is used not to establish the truth of the statements therein, but to examine only what is disclosed.

The Court of Chancery has considered documents referred to in complaints when ruling on motions to dismiss.[6] In particular instances and for carefully limited purposes, this may be an appropriate practice on a motion to dismiss. *Abbey v. E.W. Scripps Co.*, Del.Ch., C.A. No. 13397, Allen, C., mem. op. at 4 n. 1, 1995 WL 478957 (August 9, 1995) ("In deciding a motion to dismiss under Rule 12(b)(6), the court may judiciously rely on proxy statements not to resolve disputed facts but at least to establish what was disclosed to shareholders."). The practice appears to have originated with the federal courts in securities law complaints. *Patents Mgmt. Corp. v. O'Connor*, Del.Ch., C.A. No. 7110, Walsh, V.C., letter op. at 2, 1985 WL 11576 (June 10, 1985) ("[T]he federal courts, in ruling upon motions to dismiss under the Federal Rule of Civil Procedure 12(b)(6), have taken into account documents, such as proxy statements, where the complaint relies on such documents.").

The practice, however, has been viewed and justified by the federal courts as a necessary, but limited, exception to the standard Rule 12(b)(6) procedure. The exception has been used in cases in which the document is integral to a plaintiff's claim and incorporated in the complaint, such as a securities

---

6. *See, e.g., Wiener v. The Southern Co.*, Del.Ch., C.A. No. 10525, 1992 WL 12801, Jacobs, V.C. (Jan. 24, 1992); *Glaser v. Norris*, Del.Ch., C.A. No. 9538, 1992 WL 14960, Chandler, V.C. (Jan. 6, 1992); *Norman v. Paco Pharmaceutical Svcs., Inc.*, Del.Ch., C.A. No. 10417, 1989 WL 110648, Hartnett, V.C. (Sept. 22, 1989); *Lewis v. Straetz*, Del.Ch., C.A. No. 7859, 1986 WL 2252, Hartnett, V.C. (Feb. 12, 1986); *Patents Mgmt. Corp. v. O'Connor*, Del.Ch., C.A. No. 7110, 1985 WL 11576, Walsh, V.C. (June 10, 1985); *Abbey v. E.W. Scripps Co.*, Del.Ch., C.A. No. 13397, Allen, C., mem. op. at 4 n. 1, 1995 WL 478957 (August 9, 1995); *Greenfield v. National Medical Care, Inc.*, Del.Ch., C.A. Nos. 7720 and 7765, 1986 WL 6505, Berger, V.C. (June 6, 1986).

claim. *Cortec Indus., Inc. v. Sum Holding, L.P.,* 2d Cir., 949 F.2d 42, 47 (1991); *see also Pension Benefit Guar. Corp. v. White Consol. Indus. Inc.,* 3d Cir., 998 F.2d 1192, 1196 (1993) (purchase agreement); *Goodwin v. Elkins & Co.,* 3d Cir., 730 F.2d 99, 113–14 (1984) (Becker, J. concurring) (partnership agreement); *I. Meyer Pincus & Assocs. v. Oppenheimer & Co., Inc.,* 2d Cir., 936 F.2d 759, 762 (1991) (prospectus). Federal courts consider documents outside the pleadings when "the documents are the very documents that are alleged to contain the various misrepresentations or omissions and are relevant not to prove the truth of their contents but *only* to determine what the documents stated." *Kramer v. Time Warner, Inc.,* 2d Cir., 937 F.2d 767, 774 (1991) (emphasis added). Courts have also considered the relevant publication in libel cases [7], and the contract in breach of contract cases [8]. Without the ability to consider the document at issue, "complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure." *Kramer,* 937 F.2d at 774.

Cases in which claims arising out of a document are paired with substantive claims arising out of the events described in the disclosure documents present a situation which may be unique to corporation law. Considering this instance, using the Joint Proxy to consider *all* of the claims reaches well beyond the justification for the exception and leads to anomalous results. The Court of Chancery has considered a document, the Joint Proxy, which may not be admissible for all purposes at trial with respect to the *Revlon* and *Unocal* claims. If the Joint Proxy were relied upon for the truth of the matters contained therein, it would be hearsay with respect to claims other than the disclosure claims. *See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,* 9th Cir., 896 F.2d 1542, 1552–53 (1990) (holding that S–1 Registration Statement is hearsay when used to prove the truth of the matters contained therein but admitting the S–1 under the catch-all exception to hearsay rule); *White Indus., Inc. v. Cessna Aircraft Co.,* W.D.Mo., 611 F.Supp. 1049, 1068–69 (1985) (holding that Form 10–K and prospectus are hearsay with respect to the truth of matters asserted therein). At trial or on a motion for summary judgment, testimony of board members, or perhaps board minutes, may be admissible to show what the Board perceived as the threat and the justification for the defensive measures.[9] When a proxy statement is merely appended to the complaint and relied upon for the disclosure claims, but is not put forth by plaintiffs as an admission of the truth of the facts referred to therein, the defendants may not use it at the pleading stage for purposes other than disclosure issues or perhaps to establish formal, uncontested matters.

The Joint Proxy may not be considered with respect to the *Revlon* and *Unocal* claims simply because the plaintiffs also happened to allege disclosure violations in the same complaint. The mere fortuity of the presence of a disclosure claim in the same complaint with substantive claims should not open the door to wholesale use of the Joint Proxy. The Court of Chancery should not have considered the assertions in the Joint Proxy in support of defendants' motion to dismiss the *Revlon* and *Unocal* claims.

We now review the motion to dismiss *de novo* looking only to the face of the complaint. .

### B. The Duty to Seek the Highest Value Reasonably Available

Plaintiffs appear to rest their claim of a duty to seek the best value reasonably

---

7. *Fudge v. Penthouse Int'l, Ltd.,* 1st Cir., 840 F.2d 1012, 1015 (1988) (citing 5 Wright & Miller, *Federal Practice & Procedure* § 1327).

8. *Fayetteville Investors v. Commercial Builders, Inc.,* 4th Cir., 936 F.2d 1462 (1991) (contract and performance bond); *Quiller v. Barclays Am. Credit, Inc.,* 11th Cir., 727 F.2d 1067 (1984) (loan agreement); *Venture Assocs. Corp. v. Zenith Data*

*Sys. Corp.,* 7th Cir., 987 F.2d 429 (1993) (letter of intent).

9. Despite the fact that a SEC filing may constitute hearsay with respect to the truth of the matters asserted therein, courts may consult these documents to ascertain facts appropriate for judicial notice under D.R.E. 201. See *Kramer,* 937 F.2d at 773.

available on allegations that the Board initiated an active bidding process. Plaintiffs do not consider, however, that this method of invoking the duty requires that the Board also seek to sell control of the company or take other actions which would result in a break-up of the company. While the Board properly encouraged Union Pacific to improve its offer and may have used the results as leverage against Burlington, the Plaintiffs do not allege that the Board at any point decided to pursue a transaction which would result in a sale of control of Santa Fe to Burlington. Rather, the complaint portrays the Board as firmly committed to a stock-for-stock merger with Burlington.

Conspicuously absent from the complaint is a description of the stock ownership structure of Burlington. Absent this factual averment, plaintiffs have failed to allege that control of Burlington and Santa Fe after the merger would not remain "in a large, fluid, changeable and changing market." *Arnold v. Soc'y for Sav. Bancorp., Inc.*, Del.Supr., 650 A.2d 1270, 1290 (1994) (quoting *Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34, 47 (1993)).

 Plaintiffs have failed to state a claim that the Board had a duty to "seek the transaction offering the best value reasonably available to the stockholders." *Paramount v. QVC*, 637 A.2d at 43. This duty arises:

> (1) "when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company," *Paramount Communications, Inc. v. Time Inc.*, Del.Supr., 571 A.2d 1140, 1150 (1990) [*Time–Warner*]; (2) "where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the break-up of the company," *id.*; or (3) when approval of a transaction results in a "sale or change of control," *QVC*, 637 A.2d at 42–43, 47. In the latter situation, there is no "sale or change in control" when " '[c]ontrol of both [companies] remain[s] in a large, fluid,

changeable and changing market.' " *Id.* at 47 (citation and emphasis omitted).

*Arnold*, 650 A.2d at 1290 (footnote omitted).

## C. The Reasonableness of the Board's Defensive Measures

 Looking only to the face of the complaint, Plaintiffs have stated a claim under *Unocal*. Enhanced judicial scrutiny under *Unocal* applies "whenever the record reflects that a board of directors took defensive measures in response to a 'perceived threat to corporate policy and effectiveness which touches upon issues of control.' " *Unitrin*, 651 A.2d at 1372 n. 9 (quoting *Stroud v. Grace*, Del.Supr., 606 A.2d 75, 82 (1992), and *Gilbert v. El Paso Co.*, Del.Supr., 575 A.2d 1131, 1144 (1990)). Once the plaintiff establishes that defensive measures have been employed in the context of a contest for control, the Board has the burden of showing (1) that it "had reasonable grounds for believing that a danger to corporate policy and effectiveness existed," and (2) "that [its] defensive response was reasonable in relation to the threat posed." *Unitrin*, 651 A.2d at 1373 (citing *Unocal*, 493 A.2d at 955). Once the Board has established the reasonableness of its perception of a threat and the proportionality of the response, it receives the protection of the business judgment rule. *Id.* at 1374. This case differs from cases where the presumption of the business judgment rule attaches *ab initio* and to survive a Rule 12(b)(6) motion, a plaintiff must allege well-pleaded facts to overcome the presumption. *See, e.g., Levine v. Smith*, Del.Supr., 591 A.2d 194 (1991); *Grobow v. Perot*, Del.Supr., 539 A.2d 180 (1988).

In the case *sub judice*, plaintiffs have pleaded defensive measures which the Santa Fe Board undertook in the context of a battle for corporate control. The complaint states:

> The Individual Defendants breached their fiduciary duties of loyalty and care by proceeding with and completing the Joint Offer, which placed approximately 16% ownership in the hands of BNI, adopting the Poison Pill and applying it in a discriminatory manner by exempting its application as to one bidder but maintaining it as to all other interested parties, amending the Poi-

son Pill to allow Allegheny to increase its ownership of Santa Fe to 14.9%, and authorizing the Repurchase Program.

The complaint does not admit that the Board had proper grounds for its decision. Nor does the Board enjoy a presumption to that effect. The complaint does not adopt as true the facts set forth in the Proxy Statement. Thus, without benefit of the Joint Proxy, the Board cannot rely on any allegations of the complaint to meet its burden under *Unocal* and *Unitrin* to come forward with evidence supporting the reasonableness of its perception of the threat posed by Union Pacific and the proportionality of the response thereto. *See* Rule 56(e). Accordingly, when the court used the Joint Proxy for this purpose,[10] it was error.

This case may very well illustrate the difficulty of expeditiously dispensing with claims seeking enhanced judicial scrutiny at the pleading stage where the complaint is not completely conclusory. It is appropriate and consistent with the "just, speedy and inexpensive determination of every proceeding," Chancery Rule 1, that conclusory complaints without well-pleaded facts be dismissed early under Chancery Rule 12. But that is not this case. Here, there are well-pleaded allegations on the *Unocal* claim. As the terminology of enhanced judicial scrutiny implies, boards can expect to be required to justify their decisionmaking, within a range of reasonableness, when they adopt defensive measures with implications for corporate control. This scrutiny will usually not be satisfied by resting on a defense motion merely attacking the pleadings.

Accordingly, we conclude that the trial court erred in dismissing the *Unocal* claim under Chancery Rule 12(b)(6).

## V. THE AIDING AND ABETTING CLAIMS AGAINST BURLINGTON

 Burlington argues on appeal that this Court should affirm the dismissal of the aiding and abetting claim even if it reverses the judgment of the Court of Chancery with respect to any of the underlying claimed breaches of fiduciary duty. Although Bur-

lington advances a persuasive argument that Plaintiffs have failed to state an aiding and abetting claim, the Court of Chancery did not consider this argument in its decision below. This Court may, however, decide issues not reached below in the interest of orderly procedure and the early termination of litigation. *Orzeck v. Englehart,* Del.Supr., 195 A.2d 375 (1963); *Weinberg v. Baltimore Brick Co.,* Del.Supr., 112 A.2d 517, 518 (1955) ("The exercise of that power [to decide issues not reached below] is controlled by balancing considerations of judicial propriety, orderly procedure, the desirability of terminating litigation, and the position of the lower court as the primary trier of issues of fact.").

 A claim for aiding and abetting requires the following three elements: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) a knowing participation in that breach by Burlington. *Weinberger v. Rio Grande Indus., Inc.,* Del.Ch., 519 A.2d 116, 131 (1986). Plaintiffs fail to allege any facts which would state a claim against Burlington. They merely include a conclusory statement that "BNI [Burlington] had knowledge of the Individual Defendants' fiduciary duties and knowingly and substantially participated and assisted in the Individual Defendants' breaches of fiduciary duty, and, therefore, aided and abetted such breaches of fiduciary duties described above." Other than this statement, Plaintiffs have alleged no facts from which a claim for aiding and abetting breaches of fiduciary duty could be stated.

The Court of Chancery committed no error in dismissing the aiding and abetting claim.

## VI. CONCLUSION

It is to be emphasized that our holding in this case is a narrow one because the matter is before the Court on review of a dismissal of a complaint under Chancery Rule 12(b)(6). Even providing plaintiffs with the benefit of the rubric that all well-pleaded facts and reasonable inferences are taken as true on such a motion, the complaint fails to state a claim on the alleged disclosure violations, the allegation that the directors breached their

---

10. See *supra,* pages 22–23.

duty to obtain for stockholders the best value reasonably available, and the aiding and abetting claim. Accordingly, the judgment of the Court of Chancery is **AFFIRMED** as to the dismissal of these claims.

The complaint does, however, survive the Rule 12(b)(6) motion with respect to the *Unocal* claim. Accordingly, the judgment of the Court of Chancery granting the motion with respect to this latter claim is **REVERSED** and the matter **REMANDED** to the Court of Chancery for proceedings consistent with this opinion. Jurisdiction is not retained.