COURT OF CHANCERY
OF THE
STATE OF DELAWARE

KATHALEEN ST. JUDE MCCORMICK
CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

December 9, 2021

Joel Friedlander, Esquire
Jeffrey M. Gorris, Esquire
Christopher M. Foulds, Esquire
Friedlander & Gorris, P.A.
1201 North Market Street, Suite 2200
Wilmington, DE 19801

Gregory V. Varallo, Esquire
Bernstein Litowitz Berger & Grossmann LLP
500 Delaware Avenue, Suite 901
Wilmington, DE 19801

Lisa A. Schmidt, Esquire
Robert L. Burns, Esquire
Matthew D. Perri, Esquire
John M. O'Toole, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, Delaware 19801

Ryan D. Stottmann, Esquire
Alexandra Cumings, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
Wilmington, DE 19801

Re: *In re Mindbody, Inc., Stockholder Litigation*,
Cons. C.A. No. 2019-0442-KSJM

Dear Counsel:

This letter resolves the motion to dismiss filed by three defendants.[1] The first

movant is Eric Liaw, a partner in venture capital fund Institutional Venture Partners.[2] The

other two movants are related entities, Institutional Venture Partners XIII, L.P. ("IVP 13"),

and its general partner, Institutional Venture Management XIII LLC (together, "IVP").[3]

---

[1] *See* Cons. C.A. No. 2019-0442-KSJM, Dockets ("Dkt.") 339 ("Defs.' Opening Br."), 362 ("Pls.' Ans. Br."), 383 ("Defs.' Reply Br."). Defined terms used herein have the same meaning ascribed to them in the court's October 2, 2020 Memorandum Opinion (the "October Opinion"). Dkt. 216.

[2] Dkt. 336 ("Sec. Am. Compl.") ¶ 26.

[3] Sec. Am. Compl. ¶¶ 27, 28.

Liaw's journey in this case has been circuitous. When named originally as a defendant, Liaw moved for dismissal.[4] The plaintiffs argued in response that Liaw was conflicted because IVP was seeking to exit its Mindbody investment and that Liaw formed an alliance with Stollmeyer to bring about a near-term sale.[5] In the October Opinion, I granted Liaw's motion.[6] While making the plaintiff-friendly assumption that Liaw suffered from a disabling conflict of interest, I held nevertheless that the plaintiffs had not alleged facts connecting Liaw to any of the alleged process deficiencies.[7]

In a footnote in the October Opinion, I observed that dismissal of Liaw was an interlocutory order that could be reconsidered if discovery provided a compelling reason to do so.[8]

---

[4] Dkt. 7.

[5] *In re Mindbody, Inc., S'holders Litig.*, 2020 WL 5870084, at *33–34 (Del. Ch. Oct. 2, 2020).

[6] *Id.*

[7] *Id.* at *34.

[8] *Id.* at *34 n.309. Admittedly, revisiting a pleading-stage dismissal can result in inefficiencies, but a court need not ignore evidence that discovery reveals and which was unavailable to a plaintiff at the pleading stage. There is a strong public policy that dictates that courts resolve cases on their merits. *See, e.g.*, *Keener v. Isken*, 58 A.3d 407, 409 (Del. 2013) (observing that Delaware has a strong policy in favor of deciding cases on the merits); *Christian v. Counseling Res. Assocs., Inc.*, 60 A.3d 1083, 1085 (Del. 2013) (same); *Dishmon v. Fucci*, 32 A.3d 338, 346 (Del. 2011) (same); *Beckett v. Beebe Med. Ctr., Inc.*, 897 A.2d 753, 757–58 (Del. 2006) (same); *Apartment Cmtys. Corp. v. Martinelli*, 859 A.2d 67, 69 (Del. 2004) (same); *Battaglia v. Wilm. Sav. Fund Soc.*, 379 A.2d 1132, 1135 (Del. 1977) (same). This court's willingness to revisit pleading-stage dismissals when discovery unearths new and compelling information is consistent with that policy. The strictures of the law-of-the-case doctrine, as well as practical considerations taken into account by the trial court, mitigate any prejudice arising from this practice.

Discovery strengthened the plaintiffs' claims against Liaw and gave rise to claims against IVP, and the plaintiffs moved for leave to file a Second Amended Complaint to assert claims against them.[9] I granted the motion for leave to amend and made the following observation about the discovery—text messages and deposition testimony—relied on in the Second Amended Complaint:

> On their face, [the text messages] . . . support Plaintiffs' theory that Liaw formed an alliance with Stollmeyer to bring about a near-term sale within IVP's desired timeframe. The texts and deposition testimony provide support for the contention that Liaw worked to lower the Company's guidance to boost Q4 numbers in preparation [for] a quick private equity sale and communicated with Stollmeyer in the process.[10]

After I granted the plaintiffs' motion to amend, Liaw and IVP moved to dismiss the Second Amended Complaint pursuant to Rule 12(b)(6).[11] "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[12] When considering such a motion, the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[13] The court, however, need not

---

[9] *In re Mindbody, Inc., S'holders Litig.*, 2021 WL 3126762, at *1 (Del. Ch. July 23, 2021).

[10] *Id.* at *3.

[11] Dkt. 338.

[12] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[13] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

"accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[14]

Liaw relies on the exculpatory provision in Mindbody's charter as a basis for dismissal. Under *Cornerstone,* a plaintiff seeking to assert a claim against a director protected by an exculpatory provision must plead "facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests . . . or acted in bad faith."[15] A plaintiff can satisfy this burden by "alleg[ing] facts that support a reasonable inference of a divergent interest, regardless of the source, that rises to the level of a disabling conflict."[16] "Delaware law recognizes that liquidity is one benefit that may lead directors to breach their fiduciary duties if a desire to gain liquidity caused them to manipulate the sales process and subordinate the best interests of the corporation and the stockholders as a whole."[17]

The Second Amended Complaint alleges facts from which it is reasonable to infer that Liaw both had interests that diverged from the stockholders and was neck-deep in the

---

[14] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

[15] *In re Cornerstone Therapeutics S'holder Litig.*, 115 A.3d 1173, 1179–80 (Del. 2015).

[16] *Firefighters' Pension Sys. of City of Kan. City, Mo. Tr. v. Presidio*, 251 A.3d 212, 256 (Del. Ch. 2021); *see also Mindbody*, 2020 WL 5870084, at *16 ("At the pleading stage, the question is whether it is reasonably conceivable that the fiduciary was subjectively affected by the conflict at issue.").

[17] *Mindbody*, 2020 WL 5870084, at *15 (cleaned up) (collecting cases).

process deficiencies identified in the October Opinion. The following facts are alleged in

or reasonably inferable from the Second Amended Complaint:

- In 2018, IVP decided to liquidate $200 million of its IVP 13 fund by the end of the year.[18]

- To achieve the $200 million goal, Liaw needed to liquidate at least a portion of IVP's position in Mindbody.[19]

- Selling a large block of Mindbody shares on the market could depress the trading price of Mindbody's public stock because of the Company's limited public float.[20]

- Taking action that would depress the trading price of Mindbody's public stock was an unattractive proposition for Mindbody's remaining stockholders, including IVP.[21]

- IVP therefore had an incentive to push for a sale of Mindbody as a whole instead of selling only a portion of its position.[22]

---

[18] Sec. Am. Compl. ¶ 51 ("On March 9, 2018, Liaw wrote to Stollmeyer to advise him that IVP was 'contemplating a disposition . . . . Again, no decisions have been made but I just wanted to let you know that there was some of this swirling around in our firm.'"); *id.* ¶ 52 ("On August 13, 2018, the partners of IVP met and 'agreed to target at least $200M in additional liquidity by year end' for IVP 13.").

[19] *See id.* ¶ 52 (alleging that at least $160 million of the targeted amount of additional liquidity was slated to come from IVP's holdings in four particular public companies, which included Mindbody, that as of August 3, 2018, the total value of IVP 13's positions in those four companies was approximately $244 million, that IVP 13 valued its position in Mindbody at approximately $93 million, and that doing the math, it was obvious that IVP 13 would have to sell at least a portion of its Mindbody position in order to reach the $200 million goal).

[20] *Id.* ¶ 56.

[21] *Id.*

[22] *Id.* ¶ 57.

- In August 2018, Stollmeyer told the lead independent board member that he was ready to cease being Mindbody's CEO.[23]

- Through a Qatalyst financial advisor, Jeff Chang, Stollmeyer was introduced to and became somewhat enamored with Vista.[24]

- On October 16, Vista expressed to Stollmeyer an interest in acquiring Mindbody.[25]

- On October 18, Stollmeyer spoke to Liaw and told him, among other things, about Vista's expression of interest.[26]

- Stollmeyer did not inform the Board of Vista's expression of interest until October 24.[27]

- In response to the expression of interest, on October 26, the Company discussed forming a Transaction Committee.[28]

- Before the Company formed the Transaction Committee, Stollmeyer and Liaw had decided that Liaw would chair the committee.[29]

- In a text message sent during the October 26 board meeting to another Mindbody director, Adam Miller, Liaw wrote that he was now willing to support a sale of Mindbody for approximately $33.50 per share, a price he would not have supported previously.[30]

- The Board made Liaw chair of the Transaction Committee.[31]

---

[23] *Id.* ¶ 63.

[24] *Id.* ¶¶ 65, 71–72.

[25] *Id.* ¶¶ 81–82; *see also Mindbody*, 2020 WL 5870084, at *4.

[26] Sec. Am. Compl. ¶ 84.

[27] *Id.* ¶ 85.

[28] *Id.* ¶ 92.

[29] *Id.* ¶ 93.

[30] *Id.* ¶ 95.

[31] *See id.* ¶ 26.

- The Company's outside counsel advised that the Transaction Committee should be independent and free of any influence from members of management or other directors with conflicts.[32]

- Liaw permitted Stollmeyer to attend every meeting of the Transaction Committee although Stollmeyer was not on the committee.[33]

- The Transaction Committee interviewed two financial advisers: Centerview, which had a long-standing relationship with the Company, and Qatalyst, which had a relationship with Vista.[34]

- In his October 18 conversation with Liaw, Stollmeyer stated that he preferred Qatalyst over Centerview because Centerview thought the timing was wrong to explore a potential transaction. Liaw asked to be informed of subsequent discussions with other directors and Stollmeyer replied, "I appreciate your perspective and our alignment on the key elements."[35]

- On October 25, Chang texted a Qatalyst senior banker stating that he had spoken to Liaw and that Liaw and Stollmeyer would make the decision about which banker to hire. Chang also stated that he felt good about Qatalyst being selected.[36]

- Qatalyst's proposed fees were higher than Centerview's proposed fees.[37]

- In its pitchbook, Qatalyst touted its relationship with Vista and included significant detail about Vista, but not other bidders.[38]

- In its pitchbook, Qatalyst warned that Vista, "engages in significant background work, underwrites the purchase price, moves quickly in due diligence, and will provide a final proposal with a short expiration window

---

[32] *Id.* ¶ 99.

[33] *Id.* ¶ 96.

[34] *See id.* ¶¶ 96, 103, 106.

[35] *Id.* ¶ 84.

[36] *Id.* ¶ 89; Dkt. 311 Ex. 10 (Chang texting that "I've had a lot of convos w the lead investor at IVP [Liaw]. He [Liaw] and Rick [Stollmeyer] will make the decision. I feel good about where we are.").

[37] Sec. Am. Compl. ¶ 108.

[38] *Id.* ¶ 107.

in order to 'truncate processes and reduce the ability for other potential acquirers to be able to complete diligence and provide certainty at the finish line.'"[39]

- Liaw was heavily involved in the selection of a financial advisor.[40]

- During the October 26 meeting, Miller texted Liaw regarding deal likelihood, stating: "If we have Qatalyst, a deal can get done."[41]

- The Transaction Committee hired Qatalyst.[42]

- During the October 26 board meeting, Miller texted Liaw that "the PE guys will drag it out if they think we will miss numbers." Translated, Miller warned that if Mindbody seemed likely to miss Q4 guidance, then potential private equity buyers would drag out due diligence and bidding until February, when Mindbody's stock price would be expected to decline. By contrast, if Mindbody issued lower guidance for Q4, then potential private equity buyers would be less likely to drag out the process.[43]

- Liaw served on the Audit Committee.[44]

- On October 26, 2018, White provided the Audit Committee with a first pass at guidance providing a range of $65–$67 million, which was $1 million less than Mindbody's head of financial planning and analysis had sent to White the prior evening. At that time, the Q4 revenue forecast was $67.9 million.[45]

- The head of financial planning and analysis advised, on November 2, 2018, that the Company's "flash report" did not support lowering the Q4 forecast

---

[39] *Id.* ¶ 133.

[40] *Id.* ¶ 109.

[41] *Id.* ¶ 94.

[42] *Id.* ¶ 109.

[43] *Id.* ¶ 114.

[44] *Id.* ¶ 113.

[45] *Id.* ¶ 117.

and indeed supported increasing the forecast by a few hundred thousand dollars.[46]

- On the morning of November 5, 2018, Stollmeyer was sufficiently confident in the Q4 forecast that he wanted to provide guidance of $67–$69 million. Stollmeyer stated in an email to other members of management:

  I've never played a game of lowered expectations. Not for myself, not for our team, not for our customers and certainly not for investors. This is how we got here. If I change my tune now, that would be inauthentic and disheartening. It would also sound weird to those who know me.[47]

- During the November 5 Audit Committee meeting, Stollmeyer and White provided the Audit Committee with a revised weight-adjusted forecast of $68.05 million and a revised range for proposed guidance of $66–$68 million, for which "the mid point would give us $1.1M in cushion."[48]

- Stollmeyer and Liaw spoke immediately after the Audit Committee meeting.[49]

- Stollmeyer then texted White that he was "adding a new second paragraph in my script noting our challenges." Stollmeyer deleted a portion of his script that noted Mindbody's substantial progress in various areas and replaced it with language consistent with the substantial lowering of guidance.[50]

- After the earnings call, every analyst but one downgraded or reduced its price target for Mindbody.[51]

---

[46] *Id.* ¶ 118.

[47] *Id.* ¶ 119.

[48] *Id.* ¶ 120.

[49] *Id.* ¶ 123.

[50] *Id.*

[51] *Id.* ¶ 125.

- In a text to a director on November 14, Liaw wrote "If we are missing [guidance] they [potential bidders] will slow roll us. Hence good to guide down as far as we did.[52]

- Liaw advised his partners at IVP of the market's reaction to the lowered guidance and he wrote to one partner, "I think / hope the weaker guide provides appropriate cushion as well."[53]

The above is not an exhaustive list of the plaintiffs' relevant allegations. The allegations in the plaintiffs' Second Amended Complaint make it reasonably conceivable that Liaw had a divergent interest in obtaining liquidity for IVP and took action to ensure that IVP would obtain a quick exit from its investment in Mindbody. It is also reasonable to infer that Stollmeyer harbored disabling conflicts and that Liaw was aware of those conflicts.[54] The upshot is that plaintiffs' newly discovered evidence, combined with the existing allegations, provide a compelling change in circumstance necessary to satisfy the law-of-the-case doctrine and revive the dismissed claim.[55]

As the movants argue, the plaintiffs must allege not only that Liaw was involved in the faulty process, but also that IVP harbored a liquidity-driven conflict on which Liaw acted. Quoting many decisions of this court, including my October Opinion, the movants emphasize how counter-intuitive it would be to infer that Liaw and IVP would leave money on the table in the sale process.[56] It is true that "liquidity-driven theories of conflicts can

---

[52] *Id.* ¶ 115.

[53] *Id.* ¶ 128.

[54] *Id.* ¶¶ 86, 96; *Mindbody*, 2020 WL 5870084, at *18.

[55] *See Sciabacucchi v. Malone*, 2021 WL 3662394, at *4 (Del. Ch. Aug. 18, 2021).

[56] *See* Defs.' Opening Br. at 15; Defs.' Reply Br. at 8.

be difficult to plead."[57]  It is also true that "Delaware courts have been reluctant to find that a liquidity-based conflict rises to the level of a disabling conflict of interest when a large blockholder receives pro rata consideration."[58]  Yet, in this case, the factual allegations listed above concerning Liaw's actions to secure a quick exit make it reasonably conceivable that IVP valued immediacy above value-maximization.  In short, the plaintiffs have once again alleged facts that fit the very rare fact pattern of a liquidity-driven conflict.

To state a claim for aiding and abetting against IVP, the plaintiffs must allege that IVP knowingly participated in Liaw's breach of fiduciary duty.[59]  In briefing, IVP argued for dismissal of the aiding and abetting claim based on the lack of a predicate breach by Liaw.[60]  They did not contest the issue of knowing participation, and they waived the issue by not briefing it.[61]  Having already found that it is reasonably conceivable that Liaw breached his fiduciary duty, IVP's sole argument for dismissal fails.

---

[57] *Mindbody*, 2020 WL 5870084, at *18.

[58] *Presidio*, 251 A.3d at 256 (cleaned up) (citing *Larkin v. Shah*, 2016 WL 4485447, at *16 (Del. Ch. Aug. 25, 2016)).

[59] *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 72 (Del. 1995) ("A claim for aiding and abetting requires the following three elements: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) a knowing participation in that breach by [the non-fiduciary].");  *In re Rural Metro S'holders Litig.*, 88 A.3d 54, 97 (Del. Ch. 2014), *aff'd RBC Capt. Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015).

[60] *See* Defs.' Opening Br. at 25.

[61] *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.") (citing *Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993)).

The motion to dismiss is DENIED.  IT IS SO ORDERED.

Sincerely,

*/s/ Kathaleen St. Jude McCormick*

Kathaleen St. Jude McCormick
Chancellor

cc:     All counsel of record (by *File & ServeXpress*)