# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JACK L. MARCHAND II,

    Plaintiff,

    v.

JOHN W. BARNHILL, JR., GREG BRIDGES,
RICHARD DICKSON, PAUL A. EHLERT,
JIM E. KRUSE, PAUL W. KRUSE,
W.J. RANKIN, HOWARD W. KRUSE,
PATRICIA I. RYAN, and DOROTHY
MCLEOD MACINERNEY,

    Defendants,

    and

BLUE BELL CREAMERIES USA, INC.,

    Nominal Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**C.A. No. 2017-0586-JRS**

## MEMORANDUM OPINION

Date Submitted:  June 13, 2018
Date Decided:  September 27, 2018

Robert J. Kriner, Jr., Esquire and Vera G. Belger, Esquire of Chimicles & Tikellis LLP, Wilmington, Delaware and Michael Hawash, Esquire and Jourdain Poupore, Esquire of Hawash Cicack & Gaston LLP, Houston, Texas, Attorneys for Plaintiff.

Timothy R. Dudderar, Esquire and Travis R. Dunkelberger, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware, Attorneys for Defendants John W. Barnhill, Jr., Richard Dickson, Paul A. Ehlert, Jim E. Kruse, W.J. Rankin, Howard W. Kruse, Patricia I. Ryan, Dorothy McLeod MacInerney, and Nominal Defendant Blue Bell Creameries USA, Inc.

Srinivas M. Raju, Esquire and Kelly L. Freund, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware, Attorneys for Defendants Greg Bridges and Paul W. Kruse.

**SLIGHTS, Vice Chancellor**

In a companion case, I opened my decision denying a motion to dismiss the complaint by observing, in essence, that standards matter.[1] In *Wenske*, the general partner of a limited partnership allegedly engaged in wrongdoing that led to "corporate trauma." The standard governing the general partner's conduct was a bespoke contractual standard embedded within the limited partnership agreement.[2] In this case, the standard by which to measure the conduct of corporate managers, who are alleged to have engaged in essentially the same wrongdoing that led to the same "corporate trauma," is a well-settled common law fiduciary standard first articulated by former Chancellor Allen in *In re Caremark Int'l Inc. Deriv. Litig.*[3] As noted, in *Wenske*, I determined that the plaintiffs, holders of publicly traded limited partnership units, had adequately pled a derivative claim against the general partner for breach of the limited partnership agreement. In this case, for reasons explained below, I dismiss the complaint because I am satisfied this stockholder plaintiff has failed adequately to plead that demand upon the board of the company—

---

[1] *See Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *1 (Del. Ch. July 6, 2018) ("Whether conduct is right or wrong in the eyes of the law, actionable or not actionable, depends in large part upon the standard by which the conduct is measured.").

[2] *Id.* at *5 ("[The general partner] shall use its best efforts to conduct [the partnership's] business in a good and businesslike manner, and in accordance with sound business practices in the industry.") (emphasis omitted).

[3] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996).

on behalf of which he purports to prosecute his derivative claims—should be excused.

To understand how this unique circumstance has unfolded, it is necessary to understand the structure and relationship of the entities involved. Plaintiff is a stockholder of Blue Bell Creameries USA, Inc. ("BB USA"), a Delaware subchapter S corporation that serves as the holding company for the well-known Blue Bell ice cream enterprise. BB USA wholly owns Blue Bell Creameries, Inc. ("BB GP"), the general partner and exclusive manager of Blue Bell Creameries, L.P. ("BB LP" or "Blue Bell"), the enterprise's operating subsidiary. BB USA owns 69.643% of the partner's equity in Blue Bell and that ownership interest comprises all of its assets and liabilities.

Blue Bell produces and distributes Blue Bell ice cream. In early 2015, the Food & Drug Administration ("FDA") and several state health agencies found *Listeria monocytogenes* bacteria in many of Blue Bell's ice cream products.[4] By April 2015, Blue Bell had recalled all of its products and shut down all of its operations. Soon after, Blue Bell fired more than one-third of its workforce and

---

[4] *Listeria monocytogenes* is a pathogenic bacterium that causes listeriosis, a serious infection that kills approximately 260 people per year in the United States. *See* U.S. Dep't of Health & Human Servs. (CDC), *Listeria (Listeriosis)*, https://www.cdc.gov/listeria/index.html (last updated June 29, 2017). D.R.E. 202(b)–(c) (The Court may take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

ceased paying distributions to its limited partners.[5] Faced with a growing liquidity crisis, BB USA was forced to seek emergency outside financing on "massively dilutive" terms.[6]

In *Wenske*, limited partners brought derivative claims against BB GP, BB USA and members of the BB USA board of directors (the "BB USA Board") alleging, among other claims, breach of fiduciary duty and breach of Blue Bell's limited partnership agreement relating to the Blue Bell *Listeria* crisis. For reasons stated at some length in a Memorandum Opinion, I dismissed the breach of fiduciary duty claims and the claims against BB USA and members of the BB USA Board.[7] I declined, however, to dismiss the breach of contract claim against BB GP upon concluding that the complaint adequately pled the general partner had not "use[d] its best efforts to conduct [the partnership's] business in a good and businesslike manner, and in accordance with sound business practices in the industry."[8]

In this action, Plaintiff, a BB USA stockholder, purports to bring derivative claims on behalf of BB USA against two BB USA corporate officers (the "Officer

---

[5] Compl., pmbl., ¶¶ 6, 70.

[6] Compl. ¶ 81.

[7] *Wenske*, 2018 WL 3337531, at *2.

[8] *Id.* at *13–14 (citing multiple industry standards that governed Blue Bell's sanitary practices and concluding that the complaint pled a reasonably conceivable basis to conclude that those standards had not been met).

3

Defendants"), and all BB USA directors except one (the "Director Defendants") (collectively, the "Defendants"), for breach of fiduciary duty. Specifically, the Verified Derivative Complaint (the "Complaint") sets forth two counts[9]:

- Count I, against Paul Kruse and Greg Bridges, in their capacity as BB USA officers, for "breach[ing] their fiduciary duties of loyalty and care" to BB USA by failing to "take any steps to correct or control . . . essential issues regarding [the] health and safety of [Blue Bell's] products[,] despite their knowledge that *Listeria* was present in [Blue Bell's] products" and manufacturing facilities.[10]

- Count II, against BB USA directors (other than Bill Reimann), for "breach[ing] their fiduciary duties of loyalty" to BB USA "by the[ir] willful failure to govern the management of [BB LP] and to institute fundamental controls over managerial operations,"[11] including "controls to monitor for, avoid and remediate contamination and conditions exposing [BB LP] to contamination."[12]

Defendants have moved to dismiss the Complaint under Court of Chancery Rules 23.1 and 12(b)(6). For the reasons that follow, I dismiss the Complaint under Rule 23.1. As for Count I, even assuming Plaintiff has pled a viable fiduciary claim against the Officer Defendants, an assumption that may or may not be valid, Plaintiff has failed to plead particularized facts to raise a reasonable doubt that a majority of

---

[9] The Complaint was prepared with the benefit of documents obtained by Plaintiff under 8 *Del. C.* § 220.

[10] Compl. ¶¶ 143–44.

[11] Compl. ¶ 148.

[12] Compl. ¶ 149.

4

the BB USA Board members could have impartially considered a pre-suit demand to prosecute Count I. As for Count II, Plaintiff has failed to state a *Caremark* claim against the Director Defendants and, consequently, has failed to plead particularized facts to raise a reasonable doubt that a majority of the otherwise disinterested BB USA Board could have exercised their business judgment in responding to a demand.

## I. BACKGROUND

The facts are drawn from the allegations in the Complaint, documents incorporated by reference or integral to that pleading and judicially noticeable facts.[13] For purposes of this Motion to Dismiss, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiff's favor.

### A. The Parties and Relevant Non-Parties

Plaintiff, Jack Marchand II, is a stockholder of nominal defendant, BB USA, a Delaware corporation headquartered in Brenham, Texas.[14] He is alleged to have held twenty-nine shares of BB USA common stock at all relevant times.

---

[13] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995)) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

[14] Compl. ¶¶ 6–7.

As noted, BB USA serves as a holding company. Its only assets are: (1) 2,823 Class A limited partnership units in non-party Blue Bell, a Delaware limited partnership; and (2) a 100% ownership interest in non-party BB GP. BB GP is a Delaware corporation and BB LP's general partner, vested by contract with the exclusive authority to manage Blue Bell's business affairs.[15] As of 2015, Blue Bell operated three manufacturing plants located in Brenham, Texas, Broken Arrow, Oklahoma and Sylacauga, Alabama.[16]

Defendant, Paul Kruse, has served as a BB USA director since 1983, and previously served as BB USA's President and Chief Executive Officer from 2004 to 2017.[17] He is the son of Ed Kruse and the nephew of Howard Kruse (both previous

---

[15] Compl. ¶ 8. The Complaint refers to BB USA as the "Company" or "Blue Bell," *see* Compl., pmbl., and alleges, among other things, that "[t]he Company and its Board members are subject to heavy regulations at the federal and state levels because Blue Bell is a producer and distributor of food products." Compl. ¶ 149. BB USA, however, does not manufacture or distribute anything; it is a holding company. *See* Compl. ¶ 8 ("Blue Bell's ownership interests in [BB] LP [and BB GP] constitute all of the assets and liabilities of the Company."). BB LP is the only operating entity within the Blue Bell enterprise. For the sake of clarity, therefore, I have elected not to adopt the Complaint's naming conventions.

[16] Compl. ¶ 25.

[17] Compl. ¶¶ 14, 41. Paul Kruse also served as Chairman of BB USA's Board from 2014 to 2017. *Id.*

6

CEOs of BB USA), making him the third generation of his family to lead the Blue Bell enterprise.[18]

Defendant, Greg Bridges, has served as a BB USA director since 2011, and currently serves as BB USA's "Vice President of Operations."[19] It appears he is also a BB GP officer and, as such, oversees "all aspects of [Blue Bell's] plant operations."[20] Bridges is the son of Howard and Ed Kruse's sister, Mildred. As Vice President of Operations, Bridges reported to his cousin, Paul Kruse (as BB USA CEO and Chairman of the BB USA Board), at all times relevant to the Complaint.[21]

Defendant, Howard Kruse, began serving as a BB USA director in 1985. He previously served as BB USA President from 1986 to 2004, and CEO from 1993 to 2004.[22] He is the uncle of Directors Paul Kruse and Bridges.

---

[18] *Id.* "In all, members of the Kruse family appear to control at least 42.5% of the Company stock." Compl. ¶ 14. Ed Kruse is deceased; he died in 2015. Compl. ¶ 10.

[19] Compl. ¶ 10.

[20] *Id.*

[21] *Id.*

[22] Compl. ¶ 16.

Defendant, Jim Kruse, has served as a BB USA director since 2004.[23] He is the current Chairman of the BB USA Board, having succeeded Paul Kruse in that role.[24] He is the son of Howard Kruse, the nephew of Ed Kruse and cousin of Bridges and Paul Kruse.[25]

Defendant, Richard Dickson, has been a BB USA director since 2010 and currently serves as BB USA's President.[26] It appears that Dickson also previously served in various operational roles at BB GP, including "plant manager of [BB LP's] Broken Arrow, Oklahoma [production] plant."[27] Prior to becoming President in 2017, Dickson was "in charge of all areas of sale and promotion."[28]

Defendant, John Barnhill, Jr., has served as a BB USA director since 1974. He "grew up in Brenham" and "officially joined Blue Bell in 1960" when Blue Bell's then-CEO, Ed Kruse, "recruited him to be [BB USA's] sole Houston salesman."[29]

---

[23] Compl. ¶ 13.

[24] *Id.*

[25] Compl. ¶¶ 10, 13–14, 16.

[26] Compl. ¶ 11.

[27] *Id.*

[28] *Id.*

[29] Compl. ¶ 9.

"Barnhill worked his way up to Vice President in 1986, [and] retir[ed] as a [BB USA] officer in 2000."[30]

Defendant, Patricia Ryan, began serving as a BB USA director in 1997.[31] It is alleged that Ryan "begged Ed Kruse to write his memoir for years."[32]

Defendant, Dorothy McLeod MacInerney, has served as a BB USA director since 1994.[33] MacInerney is the author of a book that features a comprehensive history of the Blue Bell business.[34] She also wrote a biography of Ed Kruse entitled *Ed F. Kruse of Blue Bell Creameries*.[35]

---

[30] *Id.*

[31] Compl. ¶ 17.

[32] *Id.*

[33] Compl. ¶ 18.

[34] The book, released in 2006, is entitled *Blue Bell Ice Cream: A Century at the Little Creamery in Brenham, Texas 1907-2007*. *Id.* In the book's foreword, Paul Kruse wrote, "[a]nd a sincere word of appreciation goes to [MacInerney] for contributing her unending work in putting this story together so that it might be shared." *Id.*

[35] *Id.* "In the acknowledgement section of this book, [MacInerney] thanks Ed and Paul Kruse for 'giving [her] the honor and privilege to learn more about Blue Bell Creameries and the Kruse family.' She also state[s that] she [is] 'grateful for their support, time, and encouragement in the process of writing down this inspiring and worthwhile story.'" *Id.*

Defendant, Paul Ehlert, began his service as a BB USA director in 2002.[36] According to the Complaint, "[t]he Ehlert and Kruse families are both old Brenham families who have remained close throughout the years."[37]

Defendant, W.J. Rankin, has served as a BB USA director since 2004, and previously served as BB USA Chief Financial Officer from 1986 to 2014.[38] It is alleged that, in 2010, Rankin "joined with Ed Kruse and Friends [undefined] to present a $450,000 check to the Blinn College Foundation for the newly constructed agricultural facility on the Brenham campus" that was named the "W.J. Rankin Agricultural Complex" in Rankin's honor.[39]

Non-party, Bill Reimann, began serving as a BB USA director in 2015 (after the *Listeria* issues were discovered at Blue Bell) when Moo Partners, L.P. ("Moo"), a private equity fund affiliated with Sid Bass,[40] invested significantly in Blue Bell (an investment that flowed up to BB USA) in response to the Blue Bell liquidity

---

[36] Compl. ¶ 12.

[37] *Id.* In this connection, it is alleged that "Ehlert's uncle . . . was an old friend of [Ed and Howard Kruse's father] and served as a pallbearer at his funeral" in 1951. *See* Compl. ¶¶ 12, 22.

[38] Compl. ¶ 15.

[39] *Id.*

[40] Compl. ¶ 73.

crisis.[41]  Reimann, who is also Rankin's brother-in-law, serves as Moo's Vice President.[42]  In conjunction with Moo's investment, BB USA's certificate of incorporation was amended to grant Moo the right to appoint one director designee to the BB USA Board who would control one-third of the Board's total voting power.[43]  Reimann is Moo's Board designee.[44]

## B. Health Agency Inspections Reveal Unsanitary Conditions

The Complaint draws facts from FDA and state health agency inspection reports, as well as internal company reports, to paint a checkered—albeit incomplete—history of various sanitary issues at Blue Bell's three production plants from 2009 through the *Listeria monocytogenes* crisis in early 2015.  These reports are integral to the Complaint and so I discuss them in some detail below.

The Complaint cites reports of unsanitary conditions at Blue Bell plants dating back to 2009.  A report of an FDA inspection of the Brenham plant, dated July 24, 2009, noted two instances of uncontained condensation, "one from a pipe carrying liquid caramel . . . dripping into three gallon cartons waiting to be filled, and one

---

[41] Compl. ¶ 19.

[42] Compl. ¶¶ 15, 19.

[43] Compl. ¶ 19.

[44] *See* Compl. ¶¶ 19, 86.

11

dripping into ice cream sandwich wafers."[45]  In response, that same day, Blue Bell installed "stainless steel shrouds with sanitary welds around the fillers of all ice cream sandwiches" to address the issue, and the FDA "verified" the fix.[46]  In a follow-up letter to the FDA, Paul Kruse emphasized that "condensation is treated by Blue Bell as a serious concern."[47]

In a May 12, 2010 inspection report, the FDA noted a condensation drip, "ripped and open containers of ingredients, inconsistent hand-washing and glove use and a spider and its web near the ingredients."[48]  The report also verified that the earlier condensation issues from July 2009 had been corrected.[49]

A February 29, 2012 report noted that "no significant objectionable conditions [were observed,] [no] FDA 483 [for violations] was . . . issued" and "[n]o voluntary corrections were implemented during the inspection."[50]  Similarly, an FDA report

---

[45] Compl. ¶¶ 48–49.

[46] Oct. 30, 2017 Transmittal Aff. of Daniyal Iqbal in Supp. of Defs.' Opening Br. in Supp. of Their Joint Mot. to Dismiss ("Oct. 30 Iqbal Aff."), Ex. G (July 24, 2009 FDA Inspection Report of Brenham Facility) at 8.

[47] Compl. ¶ 49.

[48] Compl. ¶ 51.  *See also* Defs.' Mot. to Dismiss Opening Br. ("Defs.' Opening Br.") 17; Oct. 30 Iqbal Aff., Ex. I ("May 12, 2010 FDA Inspection Report of Brenham Facility").

[49] May 12, 2010 FDA Inspection Report of Brenham Facility 1–2.

[50] Oct. 30 Iqbal Aff., Ex. B ("Feb. 29, 2012 FDA Inspection Report of Brenham Facility") at 11.  Other FDA reports from around this same time provide an overview of Brenham's procedures and systems for training, operations, quality control, reporting and sanitation.

dated April 4, 2012 states, "[a]t the conclusion of the inspection, there were no observations noted and a[n] FDA 483 was not issued."[51]

The Alabama Department of Public Health ("ADPH") issued various inspection reports about the Sylacauga plant's operations during 2010 to 2014. A March 29, 2010 inspection report noted "equipment left on the floor and a ceiling in disrepair in the container forming room."[52] On July 11, 2011, ADPH observed "drips from a ceiling unit and pipelines, standing water, open tank lids and unprotected measuring cups."[53] During its March 14, 2012 inspection, ADPH issued instructions "to clean various rooms and items, make repairs and [alter] fruit processing to prevent contamination."[54] In March 2013, the agency "ordered cleaning and repairs and observed an uncapped fruit tank"; "[s]imilar findings" were noted during a July 24, 2014 inspection.[55]

---

*See,* e.g., Oct. 30 Iqbal Aff., Ex. D ("Apr. 4, 2012 FDA Inspection Report of Brenham Facility") at 4–7.

[51] Apr. 4, 2012 FDA Inspection Report of Brenham Facility 2.

[52] Compl. ¶ 50.

[53] Compl. ¶ 52.

[54] Compl. ¶ 54.

[55] *Id.*

Of Blue Bell's three plants, the Complaint suggests that the Broken Arrow facility was most prone to negative reporting from regulators regarding unsanitary conditions.[56] For instance, in a March 28, 2012 report, the FDA observed a "[f]ailure to manufacture foods under conditions and controls necessary to minimize contamination" and "[f]ailure to handle and maintain equipment, containers and utensils used to hold food in a manner that protects against contamination."[57] In response, that same report noted that Blue Bell attributed the first issue to one employee, "acknowledged the employee's behavior [was] unacceptable, and then . . . pointed out the behavior to the line supervisor, who immediately corrected the employee."[58] With respect to the second problem—product labeling issues and observations of residue on packaging—Blue Bell again "acknowledged that all containers should be labeled," and that "buckets would be visually checked for filth

---

[56] According to a March 30, 2011 FDA inspection report, Blue Bell identified Paul Kruse and Bridges as the "responsible Company officers" for FDA issues at this and other Blue Bell plants. Compl. ¶ 47.

[57] Compl. ¶ 53.

[58] Oct. 30 Iqbal Aff., Ex. C ("Mar. 28, 2012 FDA Inspection Report of Broken Arrow Facility") at 12. BB LP also addressed its response to correct these issues in a follow-up letter to the FDA. *See* Oct. 30 Iqbal Aff., Ex. J ("Apr. 9, 2012 Letter to the FDA").

and residue."[59]  The report concluded by noting an issue from the previous inspection in March 2011 (i.e., "no soap at hand sink") was "verified to be corrected."[60]

In addition to FDA inspections, Blue Bell monitored operations at Broken Arrow on its own during this time period.  Internal Blue Bell tests for *Listeria* spp. found presumptively positive tests dating back to 2013.[61]  A later FDA report noted the findings were on "non-food contact areas" and "surfaces."[62]  Follow-up sampling taken in January and April 2014 and tested by Blue Bell's "third party laboratory" also yielded positive results for *Listeria* spp.[63]  On three occasions in April 2014, internal company tests revealed "positive coliform [results] far above the known regulatory limit" of 20 CFUs/mL.[64]  Subsequent samples showed elevated coliform levels twice in January 2015, and five times in February 2015.[65]

---

[59] Mar. 28, 2012 FDA Inspection Report of Broken Arrow Facility 12.

[60] *Id.* at 13.

[61] Compl. ¶¶ 96, 101, 102, 106 & Ex. B at 3–4.

[62] Compl., Ex. B at 3.

[63] Compl. ¶¶ 96, 101, 102.

[64] Compl. ¶ 96 & Ex. B at 3–4.  The samples taken on April 15, 22 and 25 showed coliform levels of 33 CFUs/mL, 34 CFUs/mL and 105 CFUs/ML, respectively.  *See* Compl., Ex. B at 4.

[65] Compl. ¶ 96 & Ex. B at 3–4.  The Complaint notes one positive result in January 2015, but the FDA report notes elevated results on both January 12 and January 21, 2015.  *Compare* Compl. ¶ 96, *with* Compl., Ex. B at 3–4.  The Complaint, however, does not draw a connection between elevated coliform levels and the *Listeria* crisis.  Instead, it appears

Plaintiff alleges the minutes of BB USA's monthly Board meetings in 2014 show "a lack of reporting from management to the Board regarding contamination" and no "report or discussion regarding *Listeria* or positive test results."[66] Specifically, "there is no reference to *Listeria* or the lab reports in the minutes" for January, February or March 2014, and neither the *Listeria* nor coliform test results were reported or discussed in April 2014.[67] While the April 29, 2014 minutes do reference a report Bridges delivered to the BB USA Board regarding "Broken Arrow and Sylacauga plant operations," they provide no further details regarding the specific topics addressed in the report.[68]

Other BB USA Board meeting minutes from 2014 show regular reports from Paul Kruse and Bridges on plant and manufacturing operations, although there are no specific mentions of sanitary conditions.[69] The reports, instead, addressed matters such as new equipment at the Brenham facility, a "new hardening and

---

that the references to positive coliform tests are intended to support an inference of generally unsanitary conditions at Blue Bell facilities.

[66] Compl. ¶¶ 44, 46, 101, 108. Plaintiff obtained BB USA's Board minutes beginning in January 2014. *See* Compl. ¶ 101.

[67] Compl. ¶¶ 101, 102, 108.

[68] Compl. ¶ 102.

[69] June 13, 2018 Transmittal Aff. of Vera Belger in Supp. of Pl.'s Supplemental Letter in Opp'n to Defs.' Mot. to Dismiss ("June 13 Belger Aff."), Ex. C ("Apr. 29, 2014 BB USA Board Meeting Mins.") at 3.

palletizing area," "newly hired personnel" and "a good report from the TCEQ."[70] The June 26, 2014 BB USA Board meeting minutes state that Bridges reported on several items, including production, "training grants," an oven overhaul to "help out with production volumes and product quality" and, notably, that "[B]oard members will be touring the new palletizing and cold storage area after next month's meeting."[71] According to Plaintiff, minutes from the September 30, 2014 BB USA Board meeting state that Bridges reported "[t]he recent Silliker audit went well," but do not state that a formal report was delivered to the Board or that the Board discussed the matter in any detail.[72] The Board meeting on October 29, 2014 featured a similar report from Bridges that "[BB LP] scored well on recent third party audits," but the minutes contain "no reference to the identities of the auditors or the [content] of the audits, and no evidence of Board discussions of the particular audit reports or information."[73]

---

[70] Apr. 29, 2014 BB USA Board Meeting Mins. 3. I assume "TCEQ" refers to the Texas Commission on Environmental Quality.

[71] June 13 Belger Aff., Ex. E ("June 26, 2014 BB USA Board Meeting Mins.") at 3.

[72] Compl. ¶¶ 104–05. Silliker served as Blue Bell's third-party auditor for sanitation issues in 2014. *See* Oral Argument on Defs.' Mot. to Dismiss. Tr. at 71:10–17 (D.I. 40).

[73] Compl. ¶¶ 105, 108.

## C. The 2015 Product Recall and Company Fallout

In 2014, Blue Bell was the best-selling ice cream brand in the United States based on its comparative sales area.[74] Its products were sold to consumers in twenty-three states; it generated revenues in excess of $700 million annually; and it paid a quarterly dividend to stockholders of $4,000 per share.[75]

On January 30, 2015, the Brenham plant "ceased production" to "undergo routine cleaning and overhauling."[76] A few days later, the South Carolina Department of Health and Environmental Control discovered *Listeria monocytogenes* bacteria in a routine sampling of Blue Bell products.[77] The Texas Department of State Health Services notified Blue Bell of a similar finding on February 13, 2015.[78] Prior to notification of the contamination, internal company tests at Brenham showed positive results for *Listeria monocytogenes* in January and February 2015.[79] The BB USA Board held a special meeting after the annual

---

[74] Compl. ¶ 24.

[75] Compl. ¶¶ 24–25.

[76] Compl., Ex. A at 2–3.

[77] Compl., pmbl., ¶¶ 59, 109.

[78] Compl., pmbl., ¶¶ 59, 61, 96, 109.

[79] Compl. ¶¶ 59, 96.

stockholders meeting on February 19, 2015.[80] The minutes reflect "no report or discussion of *Listeria*, any product contamination, facilities problems or any product recall."[81]

Although the precise date is unclear from the Complaint, on or about February 23, Blue Bell initiated a "recall of products." The recall is mentioned in the minutes of the Board's regular monthly meeting on February 25,[82] where Paul Kruse reported to the other directors that "[t]he FDA is working with Texas health inspectors regarding [Blue Bell's] recent recall of products. More information is developing and should be known within the next days or weeks."[83] Soon after, the FDA and state health agencies in Texas and Kansas found *Listeria* contamination in other Blue Bell ice cream products.[84] Unfortunately, the contamination was not contained—the Centers for Disease Control and Prevention identified ten people who contracted listeriosis as a result of the contamination, three of whom died.[85]

---

[80] Compl. ¶ 109.

[81] *Id.*

[82] Compl. ¶ 110.

[83] *Id.*

[84] Compl. ¶¶ 61–63.

[85] Compl. ¶ 63.

19

Revelations of the listeriosis cases and resulting deaths and injuries devastated Blue Bell's business. By April 2015, Blue Bell had shut down all of its production operations and instituted a recall of all products.[86] On April 10, 2015, the BB USA Board members were informed of a potential Department of Justice investigation into the contamination.[87] Contemporaneous FDA inspections of Blue Bell's manufacturing plants revealed a multitude of food safety hazards at those facilities.[88] FDA investigators inspecting the Texas Plant in March, April and May 2015 observed, among other things:

- "[f]ailure to manufacture foods under conditions and controls necessary to minimize the potential for growth of microorganisms";
- that "[t]he procedure used for cleaning and sanitizing of [plant] equipment ha[d] not been shown to provide adequate cleaning and sanitizing";
- that "[t]he plant [was] not constructed in such a manner as to prevent condensate from contaminating food and food-contact surfaces";
- "[f]ailure to clean food-contact surfaces as frequently as necessary to protect against contamination of food";
- "[f]ailure to wear beard covers in an effective manner"; and
- "[f]ailure to maintain buildings in repair sufficient to prevent food from [be]coming adulterated."[89]

---

[86] Compl. ¶¶ 65–68.

[87] Compl. ¶ 119.

[88] Compl. ¶¶ 65–68 & Exs. A at 1–4, B at 1–10 & C at 1–3.

[89] Compl. ¶ 65.

FDA inspections of the Oklahoma Plant in March and April 2015 yielded similar

negative reports, including:

- "[f]ailure to manufacture and package foods under conditions and controls necessary to minimize the potential growth of microorganisms and contamination";
- "[f]ailure to perform microbial testing where necessary to identify sanitation failures and possible food contamination";
- that "[t]he procedure use[d] for cleaning and sanitizing of [plant] equipment and utensils ha[d] not been shown to provide adequate cleaning and sanitizing treatment";
- "[f]ailure to provide running water at a suitable temperature for cleaning of equipment, utensils and food-packaging materials";
- that "[t]he plant [was] not constructed in such a manner as to prevent drip and condensate from contaminating food, food-contact surfaces, and food packaging materials";
- that "[e]mployees did not wash and sanitize hands thoroughly in an adequate hand-washing facility after each absence from the work station and at any time their hands may have become soiled or contaminated"; and
- "[f]ailure to store cleaned and sanitized portable equipment in a location and manner which protects food-contact surfaces from contamination."[90]

The FDA report on the Alabama Plant, dated April 30, 2015, detailed much of the

same:

- "[f]ailure to maintain food contact surfaces to protect food from contamination by any source, including unlawful indirect food additives";
- that "[t]he design and materials of equipment and utensils [did] not allow proper cleaning";
- that "[a]ll reasonable precautions [were] not taken to ensure that production procedure [did] not contribute contamination from any source";
- that "[e]mployees did not wash and sanitize hands thoroughly in an adequate hand-washing facility at any time their hands may have become soiled or contaminated"; and

---

[90] Compl. ¶ 66.

- that "[n]onfood-contact equipment in manufacturing areas [was] not constructed so that it [could have been] kept in clean condition."[91]

In addition to multiple lawsuits brought against Blue Bell by injured consumers,[92] the recall and complete shutdown of production caused Blue Bell to lay off 37% of its 3,900-person workforce and prompted BB USA to warn its shareholders that it was on the brink of collapse.[93] With all Blue Bell production operations shut down, Blue Bell (and BB USA) faced an impending liquidity crisis; Blue Bell needed funding for working capital of approximately $125 million.[94]

Blue Bell management promptly sought outside financing, first from JP Morgan Chase,[95] and then from Moo. Moo's proposal was to provide Blue Bell with a $125 million credit facility and $100 million cash in exchange for a warrant to acquire Blue Bell partnership interests at $50,000 per unit.[96] On May 18, 2015, the BB USA Board determined that the Moo proposal was not "the best available option for the Partnership" and authorized management to proceed with an offering

---

[91] Compl. ¶ 67.

[92] Compl. ¶¶ 87–93.

[93] Compl. ¶¶ 69–71.

[94] Compl. ¶ 71.

[95] Compl. ¶ 72.

[96] Compl. ¶ 74.

22

of convertible securities to existing stockholders and unitholders.[97] After considering a decreased revenue forecast, a drop in value, competing sponsorship proposals and an unsuccessful offering of convertible securities, however, the Board returned to Moo and entertained a revised proposal.[98]

Moo's revised proposal provided for the same levels of financing and included a provision granting Moo a warrant to purchase 42% of BB USA's stock for $50,000 per share and rights of first refusal respecting any issuances or sales of BB USA stock.[99] The revised proposal also called for an amendment to BB USA's certificate of incorporation to grant Moo the right to appoint one BB USA Board designee, who would be entitled to one-third of the Board's total voting power.[100] At its July 7,

---

[97] Compl. ¶¶ 72, 74.

[98] Compl. ¶¶ 75–82.

[99] Compl. ¶¶ 81, 86; *see* Defs.' Opening Br. 28. *See also* Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Answering Br.") 14 (The Moo proposal included "$125 million of senior secured debt with detachable warrants exercisable through January 2018 to purchase a 1/3 interest in the Company's outstanding stock and a 10% interest in Blue Bell Creameries, L.P. for $100 million. This warrant price equated to $50,000 per share.") (internal citations omitted).

[100] *See* Compl. ¶ 19. *See also* Pl.'s Answering Br. 14 ("The financing also required an amendment to the Company's Certificate of Incorporation to provide a Company Board seat to Moo Partners with 1/3 of the total Board voting power on matters submitted to the Board. With the current 11 directors on the Board, this 1/3 constitutes five of 15 votes.") (internal citation omitted).

2015 meeting, "the Board adopted a resolution accepting the [revised] Moo financing proposal and installing Reimann on the Board."[101]

## D. Federal and State Regulation of Blue Bell

Under the Federal Food, Drug and Cosmetic Act ("FDCA"),[102] managers of food manufacturers like Blue Bell must ensure, among other things, that all employees who manufacture and process food are "qualified" to do so and that the manufacturing facilities develop and implement a "food safety plan" that includes "hazard analysis," preventative controls and oversight and management of preventative controls.[103] FDA regulations implement the FDCA. Among the FDA

---

[101] Compl. ¶ 86.

[102] 52 Stat. 1040 (1938) (codified as amended at 21 U.S.C. §§ 301–399h (2012)).

[103] 21 C.F.R. § 117.126. *See also* 21 U.S.C. § 331 (prohibiting the introduction of adulterated food into interstate commerce); 21 U.S.C. § 342 (defining adulterated food); 21 U.S.C. § 350d (requiring facilities engaged in manufacturing, processing, packing, or holding food for human consumption to register with the Secretary of Health and Human Services and to assure that the FDA will be permitted to inspect such facility); 21 U.S.C. § 350c (authorizing the Secretary of Health and Human Services to regulate the establishment and maintenance of records); 21 U.S.C. § 374 (authorizing the FDA to inspect food manufacturing facilities and permitting operators to use an accredited person—as defined under § 374(g)(3)—to conduct inspections of the establishment). The FDCA is administered by the FDA, a federal agency within the Department of Health and Human Services. *See* 21 U.S.C. § 393.

24

regulations relevant here are those codified at 21 C.F.R. Parts 110 and 117, which provide, in pertinent part[104]:

- "All operations in the . . . manufacturing, packaging, and storing of food shall be conducted in accordance with adequate sanitation principles. Appropriate quality control operations shall be employed to ensure that food is suitable for human consumption and that food-packaging materials are safe and suitable. Overall sanitation of the plant shall be under the supervision of one or more competent individuals assigned responsibility for this function."[105]

- The "operator . . . in charge of a facility"[106] "must prepare . . . and implement a written food safety plan,"[107] which must include provisions for:

    o "conduct[ing] a hazard analysis to identify and evaluate based on experience, illness data, scientific reports, and other information, known or reasonably foreseeable hazards for each type of food manufactured, processed, packed, or held at your facility to determine whether there are any hazards requiring a preventive control"[108];

    o "identify[ing] and implement[ing] preventative controls to provide assurances that any hazards requiring a preventative control will be significantly minimized or prevented and the food manufactured, processed, packed, or held by [the] facility will not be adulterated under section 402 of the [FDCA]"[109];

---

[104] D.R.E. 202(a)(2) (The court "shall take judicial notice of the . . . statutes of the United States, and every state, territory and jurisdiction of the United States.").

[105] 21 C.F.R. § 110.80 ("Compliance with this requirement may be verified by any effective means . . . .").

[106] *Id.* § 117.3.

[107] *Id.* § 117.126.

[108] *Id.* § 117.130(a)(1) (the hazard analysis must identify and evaluate hazards including, pathogens, chemical hazards, facility conditions and processing procedures).

[109] *Id.* § 117.135(a)(1).

25

o implementing "[p]rocess controls . . . to ensure the control of parameters during operations such as heat processing, acidifying, irradiating, and refrigerating foods"[110];

o implementing "[s]anitation controls . . . to ensure that the facility is maintained in a sanitary condition adequate to significantly minimize or prevent hazards such as environmental pathogens, biological hazards due to employee handling, and food allergen hazards"[111];

o "establish[ing] a written recall plan for the food . . . that describe[s] the steps to be taken, and assign[s] responsibility for taking those steps"[112];

o "monitor[ing] the preventative controls with adequate frequency to provide assurance that they are consistently performed"[113];

o "verify[ing] that preventative controls are consistently implemented and are effectively and significantly minimizing or preventing the hazards . . . includ[ing] . . . product testing"[114];

o "document[ing] the monitoring of preventative controls"[115]; and

---

[110] 21 C.F.R. § 117.135(c)(1).

[111] *Id.* § 117.135(c)(3); *id.* § 117.35 (requiring physical facilities "be maintained in a clean and sanitary condition and kept in repair adequate to prevent food from becoming adulterated," and requiring verification of compliance by any effective means). *See also id.* § 117.10(a) ("Personnel must be instructed to report such health conditions to their supervisors.").

[112] *Id.* § 117.139(a)–(b).

[113] 21 C.F.R. § 117.145(b).

[114] *Id.* § 117.165(a)(2), (b)(2) (product testing must be scientifically valid, identify test microorganisms, and specify procedures).

[115] *Id.* § 117.145(c)(1).

o the documentation to be "[r]eview[ed] . . . by (or under the oversight of) a preventative controls qualified individual."[116]

Under 21 U.S.C. § 333, persons responsible for introduction of adulterated food products into interstate commerce are subject to civil and criminal penalties.[117]

The Texas Health and Safety Code, Chapter 431 and related rules, govern the manufacturing and distribution of products, including ice cream, at the Brenham plant.[118] In Oklahoma, the Broken Arrow plant is regulated by the Food Safety Rules under Title 35, chapter 37.[119] And in Alabama, the Sylacauga plant is governed under the Rules of State Board of Health, Chapter 420-3-22 for Food Establishment Sanitation, by the Bureau of Environmental Services.[120]

Despite the far-reaching regulatory schemes that governed Blue Bell's operations at the time of the *Listeria* contamination, the Complaint contains no allegations that Blue Bell failed to implement the monitoring and reporting systems required by the FDCA, FDA regulations or state statutes (or that it was ever cited

---

[116] *Id.* § 117.165(a)(4).

[117] *See also* Compl. ¶¶ 28–29.

[118] Compl. ¶ 34. *See,* e.g., Tex. Health & Safety Code Ann. §§ 431.042–431.043 (permitting the Texas Department of State Health Services to inspect facilities and examine records).

[119] Compl. ¶ 34. *See,* e.g., Okla. Stat. tit. 63, § 1-1115 (authorizing facility inspections).

[120] Compl. ¶ 34. *See,* e.g., Ala. Admin. Code r. 420-3-22.08 (requiring food establishments to hold a permit and authorizing facility inspections by the State Health Officer).

for such a failure).  Instead, the Complaint stands on the general allegations that "the Defendants breached their fiduciary duties by willfully failing to govern management and to institute any system of corporate controls and reporting at the Company regarding health and safety compliance."[121]

## E. This Litigation

Following Blue Bell's *Listeria* crisis, Plaintiff demanded and obtained books and records from BB USA under 8 *Del. C.* § 220.  He then commenced this derivative action on August 14, 2017.  Defendants moved to dismiss the Complaint on October 30, 2017.  Following the hearing on the motion, the Court requested supplemental submissions from the parties addressing certain issues relating to board oversight duties at the holding company level with respect to the operations of an indirect subsidiary.[122]  The Court received the supplemental submissions on June 13, 2018.

## II. ANALYSIS

The Motion presents several interesting issues, many of which appear to be of first impression.  Among them: (1) what are the fiduciary obligations of directors of a holding company with respect to oversight of the company's indirect operating

---

[121] Compl. ¶ 140.

[122] D.I. 42.

28

subsidiary, particularly when the subsidiary, by contract, is managed exclusively by a separate entity?; (2) do corporate officers owe *Caremark* duties?; and (3) if not, what are the fiduciary duties owed by an officer in a derivative case involving "corporate trauma" and by what standard are those duties to be measured? While these issues may well need to be addressed at some point, this is not the case to address them. Before reaching the merits of Plaintiff's derivative claims, the Court must first determine whether Plaintiff has met his burden to plead with particularity a basis for the Court to find demand futility. He has not. Having so concluded, I need not reach Defendants' arguments under Rule 12(b)(6). The analysis begins and ends with demand futility under Rule 23.1.

"[A] cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."[123] Plaintiff's claims against the Officer Defendants and Director Defendants allege harm suffered by BB USA. As such, all parties agree that the claims are derivative. Because stockholder derivative suits "by [their] very nature . . . impinge on the managerial freedom of directors,"[124] our law requires that a stockholder satisfy the threshold demand requirements of Court of Chancery

---

[123] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[124] *Id.*

Rule 23.1 before he may assume control of a claim belonging to the corporation. To do so, the plaintiff must demand that the board of directors pursue the claim or, alternatively, demonstrate that a demand on the board would be futile such that the demand requirement should be excused.[125] When a derivative plaintiff elects not to make a demand upon the board, Rule 23.1 places a heightened pleading burden on that plaintiff to meet "stringent requirements of factual particularity that differ substantially from the permissive notice pleadings" permitted by Court of Chancery Rule 8 and facilitated by Court of Chancery Rule 12(b)(6)'s reasonable conceivability standard.[126]

This Court employs one of two tests when determining whether demand on the board would be futile. The first applies when a plaintiff challenges a decision of the board of directors to take affirmative action.[127] The second, established in *Rales v. Blasband*,[128] applies where, as here, a plaintiff challenges board inaction such as when a board is alleged to have consciously disregarded its oversight

---

[125] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1044 (Del. 2004).

[126] *Brehm*, 746 A.2d at 254.

[127] *Aronson*, 473 A.2d at 814.

[128] 634 A.2d 927 (Del. 1993).

responsibilities.[129]   Under the *Rales* test, the court "must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[130]   One basis upon which the court might question the board's independence and disinterestedness under *Rales* is when the complaint pleads particularized facts regarding board inaction of a nature that would expose the board to "a substantial likelihood" of personal liability.[131]   When engaged in this inquiry, the court must be mindful that "the mere threat of personal liability . . . is insufficient."[132]

"On a motion to dismiss pursuant to Rule 23.1, the Court considers the same documents, similarly accepts well-pled allegations as true, and makes reasonable inferences in favor of the plaintiff—all as it does in considering a motion to dismiss

---

[129] *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008) ("The [*Rales*] test applies where the subject of a derivative suit is not a business decision of the Board but rather a violation of the Board's oversight duties.").  The parties do not dispute that *Rales* states the demand futility test applicable here.  *See* Defs.' Opening Br. 30; Pl.'s Answering Br. 27.

[130] *Rales*, 634 A.2d at 934.

[131] *Id.* at 936 (quoting *Aronson*, 473 A.2d at 815).  *See also In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009) ("Demand is not excused solely because the directors would be deciding to sue themselves").

[132] *Aronson*, 473 A.2d at 815.

under Rule 12(b)(6)."[133]  Given the heightened pleading requirements of Rule 23.1, however, "conclusory allegations of fact or law not supported by allegations of specific fact may not be taken as true."[134]  Because the Complaint cites documents that Plaintiff obtained through his Section 220 demand, I may consider aspects of those documents under the incorporation-by-reference doctrine to determine whether the Complaint contains sufficient allegations to demonstrate demand futility.[135]  I may also consider matters subject to judicial notice, including state and federal statutes and regulations.[136]

## A. Demand Is Not Excused as to Count I

Count I purports to state a "derivative claim for breach of fiduciary duties of loyalty and care for knowingly disregard [sic] of contammination [sic] risks and failure to oversee Blue Bell's operation and compliance" against Paul Kruse (as BB USA CEO) and Bridges (as BB USA Vice President of Operations).[137]  At first

---

[133] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 883 A.2d 961, 976 (Del. Ch. 2003) (citing *White v. Panic*, 783 A.2d 543, 549 (Del. 2001)), *aff'd*, 845 A.2d 1040 (Del. 2004).

[134] *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988).

[135] *See Reiter v. Fairbank*, 2016 WL 6081823, at *5–6 (Del. Ch. Oct. 18, 2016); *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016).

[136] D.R.E. 201, 202.

[137] Compl., Count I.

glance, one might surmise that Plaintiff is attempting to state a *Caremark* claim against corporate officers. In their Motion, Defendants vigorously maintain that a *Caremark* theory of liability does not work with respect to corporate officers.[138] Plaintiff apparently now agrees that *Caremark* is not implicated by Count I and, instead, characterizes Count I as a claim for breach of the duty of care arising out of the Officer Defendants' alleged failure to discharge their "direct acknowledged responsibility for the management of the Company's operations and the detection, prevention and correction of contamination-related problems."[139] In response, Defendants argue that the claim fails either because the officers are entitled to the presumptions of the business judgment rule or because Delaware law, in this circumstance, would require Plaintiff to allege that the officers acted in bad faith, which the Complaint fails to do.[140]

---

[138] Defs.' Opening Br. 45 (citing *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 365 (Del. 2006) ("[W]e hold that *Caremark* articulates the necessary conditions for assessing *director* oversight liability.") (emphasis supplied); *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d at 125 ("The Delaware Supreme Court made clear in *Stone* that *directors* of Delaware corporations have certain responsibilities to implement and monitor a system of oversight . . . .") (emphasis supplied)). *See also Canadian Commercial Workers Indus. Pension Plan v. Alden*, 2006 WL 456786, at *7 (Del. Ch. Feb. 22, 2006) ("[N]either logic nor precedent suggests [that a fiduciary] ha[s] a separate enforceable duty to oversee his own actions . . . .").

[139] Pl.'s Answering Br. 36.

[140] Defs.' Reply Br. in Further Supp. of Their Joint Mot. to Dismiss ("Defs.' Reply Br.") 16–19 (citing Michael Follett, *Gantler v. Stephens: Big Epiphany or Big Failure? A Look at the Current State of Officers' Fiduciary Duties and Advice for Potential Protection*, 35 Del. J. Corp. L. 563, 576 (2010) (suggesting that officers are protected by the business

As best I can tell, our courts have yet to decide the nature and scope of a corporate officer's fiduciary duties in the context of alleged oversight failures. For its part, the academy has engaged in a thorough debate of officer liability issues and, in the midst of the debate, several commentators have expressed surprise that the Delaware courts have yet to provide any specific direction.[141] While I certainly appreciate the need for guidance in this important area of our law, no new guidance will be forthcoming here. For reasons explained below, Plaintiff cannot pass through the demand futility filter. Under these circumstances, any analysis of the officer liability issues would be pure *dicta*.[142]

Plaintiff maintains that the Officer Defendants face a "substantial likelihood of liability" and that a majority of the BB USA Board members have such close ties

---

judgment rule); *Caspian Select Credit Master Fund Ltd. v. Gohl*, 2015 WL 5718592, at \*12 (Del. Ch. Sept. 28, 2015) (holding that a corporate officer may "be liable for inaction, but only if the plaintiff can satisfy the 'extremely high standard' of 'show[ing] *a lack of good faith* as evidenced by sustained or systematic failure . . . to exercise reasonable oversight.'") (emphasis supplied).

[141] *See,* e.g., Lyman P.Q. Johnson, *Corporate Officers and the Business Judgment Rule*, 60 Bus. Law. 439 (2005) (applying principles of agency and making a persuasive case that officer conduct should be evaluated under a negligence paradigm); Lawrence A. Hamermesh & A. Gilchrest Sparks III, *Corporate Officers and the Business Judgment Rule: A Reply to Professor Johnson*, 60 Bus. Law. 865 (2005) (also making a persuasive case that Delaware courts should approach officer liability in much the same manner they approach director liability). In both articles, the commentators note that Delaware courts have yet to provide definitive guidance on these issues.

[142] *See State ex rel. Smith v. Carey*, 112 A.2d 26 (Del. 1955) (holding that courts ordinarily should avoid expressing *obiter dicta*).

to the Officer Defendants, particularly Paul Kruse, that they would be incapable of impartially considering a demand to bring a fiduciary duty claim against them on behalf of BB USA. For purposes of this demand futility analysis only, I will assume, without deciding, that the Officer Defendants face a substantial likelihood of liability on Count I. Even so, Plaintiff's allegations of conflicts against a majority of the BB USA Board fall well short of the particularity mark set by Rule 23.1. Consequently, demand as to Count I is not excused.[143]

At the time Plaintiff filed his Complaint, BB USA's "demand" Board comprised eleven members: Barnhill, Bridges, Dickson, Ehlert, Rankin, Reimann, Ryan, MacInerney, Paul Kruse, Howard Kruse and Jim Kruse.[144] BB USA's certificate of incorporation provides that the total votes possessed by this eleven-member Board is fifteen.[145] Moo's designee (Reimann) is entitled to exercise five of the fifteen votes and each of the other directors is entitled to exercise one vote.[146]

---

[143] I acknowledge that the BB USA Board might be disabled from considering a demand with respect to Count I if a majority of its members faced a substantial likelihood of liability as to Count II, particularly given that both Counts rest on the same factual predicates. For the reasons discussed below, however, I am satisfied that Plaintiff has failed to state a *Caremark* claim in Count II.

[144] *Harris v. Carter*, 582 A.2d 222, 228 (Del. Ch. 1990) (Allen, C.) (holding that demand futility is determined by an assessment of the board as comprised at the time the complaint was filed).

[145] Compl. ¶¶ 19, 81.

[146] Compl. ¶ 19, 115. *See* 8 *Del. C.* §141(d) ("If the certificate of incorporation provides that 1 or more directors shall have more or less than 1 vote per director on any matter, every

35

Accordingly, for demand excusal purposes, a majority of the Board consists of a collection of BB USA directors holding a majority of the Board's voting power (i.e., at least eight votes).[147] Plaintiff concedes that Reimann and Ryan are independent.[148] As noted, together these directors possess six of the fifteen total Board votes. Plaintiff also concedes that, to avoid dismissal, he must have pled with particularity facts that raise a reasonable doubt regarding the independence of at least eight of the remaining directors.[149] As pled, the Complaint falls short of this target.

The inquiry for director independence is contextual and asks whether a director's decision was "based on the merits of the subject before the board rather than on extraneous considerations or influences."[150] "To show lack of independence, the plaintiff must allege that a director is so beholden to an interested director that his or her discretion would be sterilized."[151] Specifically, the relationship between

---

reference in this chapter to a majority or other proportion of the directors shall refer to a majority or other proportion of the votes of the directors.").

[147] It follows, then, that Reimann and any three other BB USA directors constitute a majority of the Board, as do any eight BB USA directors other than Reimann.

[148] Pl.'s Answering Br. 33.

[149] Pl.'s Answering Br. 28, 33.

[150] *Chester Cty. Empls.' Ret. Fund v. New Residential Inv. Corp.*, 2016 WL 5865004, at *9 (Del. Ch. Oct. 7, 2016); *Orman v. Cullman*, 794 A.2d 5, 25 n.50 (Del. Ch. 2002).

[151] *Chester Cty.,* 2016 WL 5865004, at *9.

the challenged director and the interested director must be "so close that one could infer that the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director."[152] With these standards in mind, the Court's function is to "count heads."[153]

### 1. Bridges, Howard Kruse and Jim Kruse

Directors Bridges, Howard Kruse and Jim Kruse are members of Paul Kruse's immediate or extended family. Defendants concede, for purposes of their Motion, that these directors "could not disinterestedly consider a suit against Paul Kruse due to their family ties."[154]

### 2. MacInerney

The Kruse family apparently makes for interesting reading; or, at least, two members of the BB USA Board thought so. According to the Complaint, Ryan

---

[152] *Robotti & Co., LLC v. Liddell*, 2010 WL 157474, at *12 (Jan. 14, 2010). *See also In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 985 (Del. Ch. 2007) ("To demonstrate that a given director is beholden to a dominant director [or officer], plaintiffs must show that the beholden director receives a benefit 'upon which the director is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to consider the corporate merits of the challenged transaction objectively.'").

[153] *In re Ezcorp, Inc. Consulting Agmt. Deriv. Litig.*, 2016 WL 301245, at *34 (Del. Ch. Jan. 25, 2016) ("To determine whether the Board could properly consider a demand, a court counts heads.").

[154] Defs.' Opening Br. 34.

"begged Ed Kruse to write his memoir."[155]  The Complaint does not say whether that book was ever written.  MacInerney, on the other hand, did write a book about the Kruse family and then another about Blue Bell.[156]  The Complaint alleges that "[t]he acknowledgments in [both] books demonstrate [MacInerney] is entranced by the Kruse family and Blue Bell and cannot consider their actions impartially."[157]  It also alleges that Paul Kruse wrote the foreword for one of the books in which he expressed "a sincere word of appreciation" to MacInerney for writing the book.[158]

While Defendants strongly contest Plaintiff's contention that MacInerney is not independent, the allegations regarding her unique ties to Paul Kruse present a close call.  Specifically, one might have reason to doubt whether MacInerney's fascination with, and apparently close connection and access to, Paul Kruse and his family will not "heavily influence [her] ability to exercise impartial judgment."[159]  When the court has reason to doubt, the court is obliged to conclude that the

---

[155] Compl. ¶¶ 17, 136.

[156] Compl. ¶¶ 18, 137.

[157] *Id*.

[158] *Id.*

[159] *Sandys v. Pincus*, 152 A.3d 124, 130 (Del. 2016).

complaint adequately pleads a lack of independence for purposes of demand futility.[160]

### 3. Dickson and Barnhill

Dickson currently serves as the President of BB USA and has worked for BB USA since 1981. "Before being named President in 2017, he served as general sales manager, plant manager of the Broken Arrow, Oklahoma plant, and then as VP of Sales and Marketing at the Company, a position he was appointed to in 2010."[161] According to the Complaint, Dickson is "indebted to the Kruse family for his career."[162]

Barnhill has either worked for or been affiliated with Blue Bell for his entire work life (nearly sixty years). Here again, the Complaint alleges that Barnhill "owes his career to the Kruse family and has close personal relationships with several members of the Kruse family," including with Jim Kruse who currently serves as President of a bank founded by Barnhill.[163]

---

[160] *In re Coopers Co., Inc. S'holders Deriv. Litig.*, 2000 WL 1664167, at *7 (Del. Ch. Oct. 31, 2000).

[161] Compl. ¶ 11.

[162] Compl. ¶ 130.

[163] Compl. ¶ 128.

Defendants contend the allegations regarding Dickson and Barnhill amount to nothing more than conclusory allegations that these directors are friendly with the Kruse family and have long-term relationships with the Blue Bell enterprise, a group of entities not dominated or controlled by the Kruse family.[164] Citing *Beam*, Defendants argue, "[m]ere allegations that [directors] move in the same business and social circles, or a characterization that they are close friends, is not enough to negate independence for demand excusal purposes."[165]

I agree with Defendants that the Complaint's allegations with respect to Dickson and Barnhill are relatively thin. But, at this stage, I must draw reasonable inferences in favor of Plaintiff, not Defendants.[166] In doing so, I count these two directors on Plaintiff's side of the ledger.[167]

---

[164] Defs.' Opening Br. 36–37.

[165] *Beam*, 845 A.2d at 1051–52.

[166] *Del. Cty. Empls.' Ret. Fund v. Sanchez*, 124 A.3d 1017, 1022 (Del. 2015).

[167] *See In re Freeport-McMoran Sulphur, Inc. S'holder Litig.*, 2005 WL 1653923, at *12 (Del. Ch. June 30, 2005) ("Latiolais had worked for the Common Directors for almost twenty years and had become a wealthy individual in their employ. To argue that Latiolais was independent of the Common Directors because he formally severed ties with some Freeport entities does not take into account the nature and extent of his overwhelming, career-long involvement with Freeport entities, including the entire span of MOXY's life. Delaware law recognizes that such extensive ties can operate as an exception to the general rule that past relationships do not call into question a director's independence.").

## 4. Ehlert

Ehlert has never worked for any Blue Bell entity. He is President of an insurance company in Brenham that has no alleged ties to Blue Bell or the Kruse family.[168] The most the Complaint can muster to challenge the presumption that Ehlert is independent is to allege that the Kruse and Ehlert families are "old Brenham families who have remained close throughout the years."[169] This court routinely finds conclusory allegations like these fail to meet Rule 23.1's particularity standard and fail to raise a reason to doubt a director's independence.[170] This case is no exception.

## 5. Rankin

Rankin worked for Blue Bell for 28 years, serving as CEO from 1986 through 2014. It is alleged that, "[d]ue to donations [totaling approximately $450,000] from the Kruse family," the "Agricultural Complex" at Blinn College was dedicated in Rankin's name. While the Complaint provides no more specifics regarding the

---

[168] Compl. ¶ 12.

[169] Compl. ¶¶ 12, 131.

[170] *Beam*, 845 A.2d at 1051–52 (allegations that directors "move in the same business and social circles, or a characterization that they are close friends, is not enough to negate independence."); *In re Martha Stewart Living Omnimedia, Inc. S'holder Litig.*, 2017 WL 3568089, at *20 (Del. Ch. Aug. 18, 2017) (same); *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 821 n.45 (Del. Ch. 2005) (same), *aff'd*, 906 A.2d 766 (Del. 2006).

donation (i.e., who gave how much), and makes no attempt to characterize the materiality of the gesture, and thus likely falls short of Rule 23.1's particularity requirement,[171] I need not reach that conclusion because the Complaint contains other allegations that provide full comfort that Rankin is independent of Paul Kruse and his family. Specifically, at paragraph 115, the Complaint describes at length a Board initiative, sponsored by the concededly independent Reimann, whereby the positions of CEO, President and Chairman of the Board, each occupied by Paul Kruse, would be divided into separate positions to be filled by different people. The BB USA Board initially voted to approve the split. When Paul Kruse objected and threatened to resign, the Board voted to rescind its previous vote and reunify the positions (to be occupied, again, by Paul Kruse). Two directors opposed rescission of the previous vote—Reimann and Rankin.[172] Given this history, Plaintiff's conclusory allegation that Rankin lacks independence falls flat.

---

[171] *See In re J.P. Morgan*, 906 A.2d at 822 n.48 (holding that allegations regarding a sizeable "philanthropic relationship" were insufficient to overcome presumption of independence when the complaint lacked allegation that would allow a meaningful assessment of materiality).

[172] Compl. ¶ 115. Rankin's vote to prevent Paul Kruse from holding the CEO, President and Chairman positions came after the allegedly disabling contribution to Blinn College. *See* Compl. ¶ 15 ("In June 2010, Rankin joined with Ed Kruse and Friends to present a $450,000 check to the Blinn College Foundation for the newly constructed agricultural facility . . . named the W.J. 'Bill' Rankin Agricultural Complex in honor of Rankin."); Compl. ¶ 115 ("The minutes of the February 25, 2016 meeting evidence . . . [Rankin] [v]oting no on the motion" to rescind the Board decision to separate the position of Chairman from the positions of President and CEO).

Even after affording all reasonable inferences to Plaintiff, I am satisfied he has failed to plead particularized facts that raise a reasonable doubt as to whether a majority of the BB USA Board could impartially consider a demand.[173]  The Complaint offers no reason to doubt that Reimann, Ryan, Ehlert and Rankin are independent of the Officer Defendants and would have been capable of impartially considering a demand.  All told, these directors control eight of the Board's fifteen votes.  Demand, as to Count I, is not excused.

## B. Demand Is Not Excused as to Count II

As Chancellor Allen first observed in *Caremark*, and has been oft-repeated by this court, proving liability for a failure to monitor corporate affairs is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[174]  A decade after Chancellor Allen's seminal decision, our Supreme Court embraced the *Caremark* standard and clarified that in order to impose personal

---

[173] As noted above, I have made the close calls in favor of Plaintiff notwithstanding that Defendants have made persuasive arguments that all of the non-Kruse family directors are independent.

[174] *Caremark*, 698 A.2d at 967.  *See also Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at \*7 (Del. Ch. Nov. 20, 2007); *Desimone v. Barrows*, 924 A.2d 908, 939 (Del. Ch. 2007); *Guttman v. Huang*, 823 A.2d 492, 506 n.33 (Del. Ch. 2003) (each quoting *Caremark*).

liability on directors for a failure of oversight, the Plaintiff must prove "the directors knew that they were not discharging their fiduciary obligations."[175]

At the pleadings stage, a plaintiff must allege particularized facts that satisfy one of the necessary conditions for director oversight liability articulated in *Caremark*: either (1) "the directors utterly failed to implement any reporting or information system or controls"; or (2) "having implemented such a system or controls, [the directors] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[176] These standards "draw heavily upon the concept of director failure to act in good faith."[177] As our Supreme Court explained in *In re Walt Disney Co. Deriv. Litig.*, the "intentional dereliction of duty" or "conscious disregard for one's responsibilities," which "is more culpable than simple inattention or failure to be informed of all facts material to the decision," reflects that directors have acted in bad faith and cannot, by default, avail themselves of defenses grounded in a presumption of good faith.[178] In order to plead a claim under *Caremark*, therefore, a plaintiff must plead facts that allow a reasonable inference the directors acted with

---

[175] *Stone*, 911 A.2d at 370.

[176] *Id.*

[177] *Id.* at 369.

[178] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 66 (Del. 2006).

"scienter" which, in turn, "requires [not only] proof that a director acted inconsistent[ly] with his fiduciary duties," but "most importantly, that the director *knew* he was so acting."[179]

Our law recognizes that "directors' good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability, or both."[180] Accordingly, "Delaware courts routinely reject the conclusory allegation that because [a corporate trauma] occurred, internal controls must have been deficient, and the board must have known so."[181] Rather, a plaintiff must plead with particularity "a sufficient connection between the corporate trauma and the board."[182]

---

[179] *In re Massey Energy Co.*, 2011 WL 2176479, at *22 (Del. Ch. May 31, 2011) (emphasis in original). *See also Reiter*, 2016 WL 6081823, at *7 ("The need to demonstrate scienter to establish liability under an oversight theory follows not only from *Caremark* itself, but from the existence of charter provisions exculpating directors from liability for breaches of the duty of care that have become ubiquitous in corporate America.").

[180] *Stone*, 911 A.2d at 373.

[181] *Desimone*, 924 A.2d at 940.

[182] *La. Mun. Police Empls.' Ret. Sys. v. Pyott*, 46 A.3d 313, 340 (Del. Ch. 2012), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013).

### 1. *Caremark*'s First Prong

Surprisingly, Plaintiff's principal argument is that the Director Defendants failed in their oversight duty under *Caremark*'s first prong by failing to implement any reporting or information systems or controls at BB USA.[183] Of course, in the same pleading, Plaintiff describes at length the intense regulatory scrutiny under which Blue Bell operated and the internal systems for detecting and reporting unsanitary conditions that these regulators required to be in place.[184] Importantly, the Complaint makes no allegation that Blue Bell failed to implement these mandated monitoring and reporting systems. To the contrary, documents incorporated by reference in the Complaint reveal that Blue Bell distributed a sanitation manual with standard operating and reporting procedures, and promulgated written procedures for processing and reporting consumer

---

[183] Of course, in this regard, Plaintiff's burden is to plead facts that support an inference that BB USA "utterly failed to implement any reporting or information system or controls." *See Stone*, 911 A.2d at 370. *See also In re Gen. Motors Co. Deriv. Litig.*, 2015 WL 3958724, at *14–15 (Del. Ch. June 26, 2015) (finding the "utterly failed" standard not met where "the Plaintiffs complain that [Defendant] could have, should have, had a *better* reporting system, but not that it had *no* such system.") (emphasis in original).

[184] *See,* e.g., 21 U.S.C. §§ 331, 342(a), 350c, 350d, 374; FDA Manufacturing, Packing, or Holding Human Food Rule, 21 C.F.R. §§ 110.80, 117.1, 117.126, 117.130(a)(1), 117.135(c), 117.139, 117.145, 117.165; Tex. Health & Safety Code Ann. § 431.001 et seq.; Okla. Stat. tit. 63, § 1-1115; Ala. Admin. Code r. 420-3-22.08. *See also* Compl. ¶ 34.

complaints.[185] Blue Bell engaged a third-party laboratory and food safety auditor to test for the presence of dangerous contaminates in its facilities.[186] And the Complaint acknowledges that Bridges, as Vice President of Plant Operations, "was responsible for all Company operations . . . [and] reported directly to Paul Kruse [the CEO and Chairman of the BB USA Board]."[187] Both Bridges and Paul Kruse, in turn, provided regular reports regarding Blue Bell operations to the BB USA Board, including reports from the TCEQ and Silliker (a third-party food safety auditor).[188]

---

[185] The FDA inspection reports detail Blue Bell's procedures and systems for training, operations, quality control, reporting and sanitation. *See,* e.g., July 24, 2009 FDA Inspection Report of Brenham Facility 3; May 12, 2010 FDA Inspection Report of Brenham Facility 7; Feb. 29, 2012 FDA Inspection Report of Brenham Facility 4, 7–8, 10–11 ("All new employees undergo initial training in GMP, hand washing and sanitation, and food handling . . . . New refresher videos and coursework are provided [periodically] . . . . Training is documented . . . . The firm also provides employees with . . . internal training for each department [and] . . . food safety training . . . . The firm also receives training . . . on food protection. [. . .] [Critical Control Points] have monitoring, verification/validation and recordkeeping associated with them. . . . There are employees in Quality Control who oversee testing, certificates of analysis and incoming product evaluations. . . . Environmental swabs are taken . . . . The firm has a sanitation manual with [standard operating procedures] . . . . The firm has a procedure for documenting and investigating complaints. [. . .] The firm conducts mock recalls . . . ."); Oct. 30 Iqbal Aff., Ex. K ("Mar. 30, 2011 FDA Inspection Report of Broken Arrow Facility") at 3–4; Mar. 28, 2012 FDA Inspection Report of Broken Arrow Facility 5; Apr. 4, 2012 FDA Inspection Report of Brenham Facility 4–7.

[186] Compl. ¶¶ 96, 100, 101, 104–05. *See also* Mar. 28, 2018 Transmittal Aff. of Daniyal Iqbal in Further Supp. of Defs.' Joint Mot. to Dismiss ("Mar. 28 Iqbal Aff."), Ex. C at 3 ("The recent Silliker audit went well.").

[187] Compl. ¶ 47.

[188] Apr. 29, 2014 BB USA Board Meeting Minutes; Compl. ¶¶ 104–05.

From his Answering Brief, it appears Plaintiff's theory under *Caremark*'s first prong is that the BB USA Board utterly failed in its oversight duty because it "had no audit or other supervisory structure or committee with responsibility for oversight of health, safety and sanitation controls and compliance."[189]  In support of this argument, Plaintiff cites two cases where our courts have noted the lack of an audit committee at the board level "might" be evidence of a failure of oversight in a case where accounting irregularities cause some form of corporate trauma.[190]  Plaintiff, of course, cites no authority for the proposition that a board of directors must create a committee to monitor and manage every aspect of risk the corporation might face, particularly when there is undisputed evidence that risk management measures have been taken in the company's operational theater and the Board received reports regarding operations at regular intervals.[191]

---

[189] Pl.'s Answering Br. 20.

[190] *See David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *5 (Del. Ch. Feb. 13, 2006) (addressing *Caremark* claim in the wake of the Enron and WorldCom accounting disasters and noting allegations that the board utterly failed to "assure the existence of reasonable information and reporting systems . . . *might* take the form of facts that show the company entirely lacked an audit committee.") (emphasis supplied), *aff'd*, 911 A.2d 802 (Del. 2006) (TABLE); *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *18 (Del. Ch. May 21, 2013) (quoting *Shaev* when addressing a *Caremark* claim arising from "business fraud").

[191] Compl. ¶¶ 47, 104–05, 110–11 (acknowledging reports of operational issues from Paul Kruse to other members of the Board).  *See Stone,* 911 A.2d at 373 (finding adequate the board's oversight practice of "relying on periodic reports from [employees at the operational level of the company]").

What Plaintiff really attempts to challenge is not the *existence* of monitoring and reporting controls, but the *effectiveness* of monitoring and reporting controls in particular instances.[192] This is not a valid theory under the first prong of *Caremark*.[193] To state a first prong *Caremark* claim, Plaintiff was obliged to plead particularized facts to support his contention that the BB USA Board "utterly" failed to adopt or implement *any* reporting and compliance systems.[194] The Complaint pleads no such facts.

### 2. *Caremark*'s Second Prong

To establish demand futility under *Caremark*'s second prong, the Complaint must "plead [particularized facts] that the board knew of evidence of corporate misconduct—the proverbial 'red flag'—yet acted in bad faith by consciously

---

[192] *See,* e.g., Compl. ¶¶ 66, 96, 100, 112, 121.

[193] *See Caremark*, 698 A.2d at 971 ("only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability.").

[194] *See Stone*, 911 A.2d at 373 (admonishing that "good faith in the context of oversight must be measured by the directors' actions to assure a reasonable information and reporting system exists and not by second-guessing after the occurrence of employee conduct that results in an unintended adverse outcome"). In *Stone*, the Supreme Court appears quite deliberately to have inserted the adverb "utterly" as a modifier to the phrase "failed to implement any reporting or information system or controls." *Stone*, 911 A.2d at 370. "Utterly" means "carried to the utmost point or highest degree; absolute, total." *Utterly*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary /utterly (last visited Sept. 9, 2018).

49

disregarding its duty to address that misconduct."[195]  In this context, bad faith means "the directors were conscious of the fact that they were not doing their jobs, and that they ignored red flags indicating misconduct in defiance of their duties."[196]

I confess I am unable to discern whether Plaintiff actually intends to advance a second-prong *Caremark* claim.  The Complaint identifies no specific red flag that was waving before the BB USA Board.  Indeed, it appears Plaintiff's point is that the BB USA Board did not see the *Listeria* crisis coming, but would have with proper oversight.[197]  This is not a *Caremark* claim.[198]  There were monitoring and reporting

---

[195] *Reiter*, 2016 WL 6081823, at *8 (citing *Pyott*, 46 A.3d at 341).

[196] *Armstrong*, 2006 WL 391931, at *5.  *See also In re Citigroup Inc. S'holders Litig.*, 2003 WL 21384599, at *2 (Del. Ch. June 5, 2003) (noting that a director cannot be put on "inquiry notice by something he or she never saw or heard"); *Reiter*, 2016 WL 6081823, at *7 (holding that a plaintiff must demonstrate scienter to plead a *Caremark* claim).

[197] Pl.'s Answering Br. 44.  Plaintiff does contend, in his Answering Brief, that the Board failed to "assert an active role in the management of the emerging *listeria* catastrophe" after being apprised of the issue by CEO Kruse on February 25, 2015.  *Id.* at 42–43.  The Complaint, however, pleads no facts that would support a finding of any misconduct by the Board in this regard, much less a finding of bad faith.  *South v. Baker*, 62 A.3d 1, 15 (Del. Ch. Sept. 25, 2012) (holding that plaintiff must allege that "the board consciously failed to act *after* learning about evidence of illegality") (emphasis supplied).  *See also* Pl.'s Answering Br. 44 ("The Complaint alleges that the absence of 'red flags' known by the directors . . . was due to the lack of any Board system of controls . . . .").

[198] *See Stone*, 911 A.2d at 373 (allegations that "there ultimately may have been failures by employees to report deficiencies to the Board [provide] no basis for an oversight claim seeking to hold the directors personally liable for such failures by the employees"); *In re Citigroup*, 2003 WL 21384599, at *2 (noting that a director cannot be put on "inquiry notice by something he or she never saw or heard"); *Armstrong*, 2006 WL 391931, at *5 (holding that bad faith means "the directors were conscious of the fact that they were not doing their jobs, and that they ignored red flags indicating misconduct in defiance of their duties" and that it is not enough to plead that "some hypothetical, especially zealous, board

systems in place. At best, Plaintiff has pled that those systems did not work as intended. While unfortunate, this is not a basis to impose personal liability upon the directors.

## III. CONCLUSION

In deciding that Plaintiff has failed to plead derivative claims against both the Officer Defendants and Director Defendants, I am mindful that not three months ago, in *Wenske*, I determined that other plaintiffs had stated viable claims against BB GP for failing to prevent the same *Listeria* crisis that prompted the claims here. But that case was different. The plaintiffs were situated differently (limited partners of BB LP); the defendant was situated differently (the general partner of the operating limited partnership); and the claim was vastly different (a breach of contract claim based on a provision in the LPA that incorporated a standard much more akin to negligence than fiduciary duty). Standards matter. In *Wenske*, the plaintiffs pled facts supporting a reasonable inference that the general partner had breached the LPA. Here, Plaintiff has failed to plead particularized facts that any of

---

might have discovered and stopped the conduct complained of" in order to impose oversight liability); *In re Gen. Motors*, 2015 WL 3958724, at *14 (concluding that the complaint did not allege particularized facts showing "that the Board had knowledge that [General Motors'] system was inadequate or that the Board consciously remained uninformed on this issue").

51

the Director Defendants breached their scienter-laden fiduciary duty of oversight or that a majority of the BB USA Board members could not impartially consider a demand to bring claims against the Officer Defendants.

Because Plaintiff has failed to plead particularized facts that demonstrate pre-suit demand on the BB USA Board would have been futile with respect to his breach of fiduciary duty claims, the Motion to Dismiss the Complaint with prejudice must be **GRANTED**.

**IT IS SO ORDERED.**